## WILCOX *v.* STATE.

(*Knoxville.* November 12, 1894.) ·

1. EVIDENCE. *Of nonexperts as to insanity, how weighed.*

The opinions of nonexpert witnesses as to the insanity of a person is to be received and weighed in the light of the facts and circumstances related by them and upon which their opinions are predicated. (*Post, pp. 111, 112.*)

2. SAME. *Of experts received with caution.*

The opinions of expert witnesses should be received with caution and investigated with care. (*Post, pp. 112, 113.*)

Cases cited and approved: Persons *v.* State, 90 Tenn., 291; 32 Fed. Rep., 198.

3. CHARGE OF COURT. *Requests properly refused, when.*

Requests for additional instructions to the jury are properly refused where the matters have been fully covered by the original charge. ' (*Post, pp. 113–115.*)

4. INSANITY. *When insane delusion excuses crime.*

A person otherwise rational who commits a homicide through delusion on a subject connected with the homicide, is criminally responsible, providing he is conscious of right and wrong as applied to the act, and has the ability, because of such consciousness, to choose, by an effort of the will, whether he will commit the act or not. (*Post, pp. 114–120.*)

5. SAME. *Greater indulgence extended to those insane by act of God.*

The law regards the defense of insanity with greater favor and indulgence when interposed by those insane by the act of God than when interposed by those insane by their own willful misconduct. (*Post, p. 122.*)

---

FROM CARTER.

---

Appeal from Circuit Court of Carter County. ANDREW J. BROWN, J.

Wilcox v. State.

S. J. KIRKPATRICK, R. R. BUTLER, TIPTON & SIMERLY, GEO. E. BOREN, R. A. SMITH, and C. C. COLLINS for Wilcox.

Attorney-general PICKLE for State.

WILKES, J.   C. N. Wilcox was indicted for the murder of Charles Jenkins.   He was convicted of murder in the second degree, and sentenced to ten years imprisonment in the State penitentiary, and has appealed to this Court.

The defense relied on in this Court is the insanity of the defendant at the time of the homicide, and it is insisted that the act was the result of an insane delusion upon the part of the defendant, rather than a general derangement of his entire mental faculties upon matters generally.

The deceased was an employe or hireling of the defendant, and had been, for some considerable time before the killing, an inmate of his home, and they were on the most friendly terms up to the time of the homicide.   The deceased was driving the defendant's wagon, loaded with corn, along the public road, on the day when he was killed.   Defendant's version is, that he and the deceased had some words about an accusation which deceased stated the defendant had made to a neighbor, Smith, about the shooting of Smith's cow, and in the quarrel deceased called defendant a liar, and then drew his knife, and said the matter should be settled then and there; that he, defendant, after retreating across the road to escape

deceased, drew his pistol and shot him. Defendant at the time, so far as he made any explanation, stated that he did the killing in self-defense.

The deceased made a statement, admitted as a dying declaration, in which he said, in substance, that the defendant shot him three times in the head; that he accused the deceased of "cuckolding him," which the deceased denied, and asked defendant what he was going to do about it, to which defendant replied he would show him, and thereupon shot him, and again shot him twice after he fell. The deceased further said that they had, up to that time, been friends; that, after defendant shot him, he took deceased's knife out of his (deceased's) pocket, when he begged him not to cut his throat, while he was at the time sitting "astraddle" of him. The deceased further stated that he and defendant had no trouble about a cow, and that the cow was not even mentioned in the altercation that took place at the time of the killing.

From the testimony of several witnesses, it appears that the first shot was fired into the head and face of the deceased, and he fell in the road. The horses he was driving started to run, and the defendant ran after them, and stopped and hitched them, and then came back to where the deceased was lying in the road, and shot him twice while lying in the road. An open knife was found some ten or twelve feet away, but it was not bloody, and had no indication that it had been used in the

Wilcox *v.* State.

struggle, and was not of a dangerous kind. Some parties having arrived on the scene soon after the killing, defendant withdrew some seventy-five or one hundred yards, and partially secreted himself; and, after a time, returned, and called attention of by-standers to the fact that his clothing had been cut in two places. He also called attention to the knife, and asked some of the witnesses if they saw the deceased attempting to cut him. Several witnesses who were first upon the ground, and not far from the scene of the killing, testify that defendant shot the deceased twice after he was down, and while standing over him. They are very emphatic that, at this time, the clothes of defendant had not been cut, and they state that they observed this closely, for the reason that defendant was claiming that he had shot in self-defense, and while the deceased was attempting to cut him. They are very positive and emphatic that the clothing was not cut until after defendant went off about one hundred yards, and afterwards returned, and called attention to the cutting.

It further appears that the killing created intense excitement, and caused quite a collection of citizens, and threats were made of mob violence, and that through it all the defendant appeared cool and unexcited, and strenuously objected to going to jail.

It further appears, from statements made by his counsel, that he would not, at any time after the occurrence, talk about the killing, nor consult about

any line of defense, but was urgent and persistent, at all times, that an immediate trial be had.

It appears also, that the defendant was addicted to the excessive use of morphine and cocaine, taking the drugs in doses sufficient to kill twenty men not addicted to their use, at a single dose; that he had carried on this habit for years, and had grown rapidly more and more addicted to their use, and come more and more under their influence. It is strenuously insisted that, as a result of this excessive use of opiates, together with hereditary tendencies derived from his ancestors, and kinspeople in both the direct and collateral lines, the defendant had become insane, and that his mind was filled with the delusions of a disordered brain to such an extent as to overpower his will and render him without responsibility—at least for acts done under the influence and in the direction of these delusions.

Many witnesses are examined, both experts and nonexperts, in regard to the mental condition of the defendant. It appears that he was, at one time, a man of good mental capacity, described by many of the witnesses as an exceptionally bright man; that he was an active business man; had studied and practiced medicine with success, and was regarded universally as a man competent to attend to his business affairs. He is also shown to have been an arbitrary, dictatorial man, of strong will power, and, from his boyhood, of quick, active, irritable temper, and it is insisted that many of his arbitrary and

dictatorial acts were the result, and are evidences, of his mental unsoundness and the strong hold which the drugs had obtained over his actions. Nineteen witnesses testify that the defendant had been of unsound mind for several years. Some of them are physicians, and among them Dr. Callender, superintendent of the insane asylum at Nashville, who gives his opinion upon a hypothetical case, and Dr. Campbell, superintendent of the insane asylum at Knoxville, who gives his from a personal examination. The nonexperts are gentlemen who have known the defendant for years in a business and social way, and who give facts and incidents in his life from which they form their opinions.

It is objected that the Court erred in saying to the jury, in substance, that the opinions of these nonexperts were only to be received and weighed in the light of the facts and circumstances related by them, and upon which their opinions were predicated, and that the jury must judge of the reasonableness of the opinions and conclusions from these facts and circumstances, and give them such weight as they deem proper.

The objection is, that the jury should not weigh their opinions alone from the facts upon which they are predicated, but that they should give weight to the opinions, not only from the facts and incidents detailed, but also from other facts which the witnesses might know, but which they did not state; and that it would be impracticable for any non-

expert witness to properly place before the jury the details which caused him to form his opinion, such as the appearance and demeanor of the party, his expressions of face, and the appearance of his eye, and the many peculiarities which caused him to form the conclusion he entertained.

We think there is no error in this instruction. A nonexpert witness does not testify from the same standpoint as the expert, and it is for this very reason that he is required to give the facts upon which he bases his conclusions, so that the jury may say whether his conclusions are warranted by the facts, and the opinions of the nonexpert are only valuable and competent to the extent that they are supported by the facts and circumstances upon which they are predicated. Rice on Evidence, Vol. I., page 350; Greenleaf on Evidence, Vol. I., page 581, note.

It is again insisted the Court erred in telling the jury to give the testimony of both nonexpert and expert witnesses a careful and painstaking investigation, with a view to find out the truth, and to keep from being misled or confused by it, for, says the trial Judge, "while expert testimony is sometimes the only means of, or the best way to reach the truth, yet it is largely a field of speculation, beset with pitfalls, and uncertainties, and requires patient and intelligent investigation to reach the truth." This is only the closing extract from a long and lucid charge as to the weight to be given

to such testimony, both that of nonexpert and that of expert, and the whole is substantially in conformity to the rule laid down that expert testimony is to be received with caution. *Persons* v. *The State*, 6 Pickle, 291; *United States* v. *Pendergrast*, 32 Fed. Rep., 198; Rice on Evidence, Vol. II., page 708.

It is insisted that the Court erred in refusing to give to the jury, in his charge, certain requests set out in the bill of exceptions.

The record states that the trial Judge declined to give the charges as requested, further than he had already given them in his general charge. It has been repeatedly held by this Court, that the trial Judge cannot be put in error if he decline to adopt the language of counsel in their requests, and to give a charge in the exact words or terms suggested by counsel.

If the Judge has fully and correctly stated the law on a given proposition, he can, and should, decline to recharge it by adopting a mere change in phraseology suggested by counsel. Otherwise the trial Judge must repeat and reiterate his charge in as many different forms as counsel may see proper to suggest, and thus unduly impress the jury or create confusion in their minds.

The first instruction asked is as to reasonable doubt in the minds of the jury. This question was charged upon by the trial Judge fully and repeatedly in his main charge, and in each and every possible

8—10 P

aspect of the case, and we do not think the trial
Judge was in error in refusing to repeat it again,
in the words selected by counsel.

The second request we do not consider good law,
in the shape in which it is presented. The idea
that an irresistible impulse "is an excuse for the
commission of crime, where the party is capable of
knowing right from wrong, has no foundation in our
jurisprudence." 3 Rice on Evidence, pages 642–655.

The third request is one which touches the real
and prominent point of defense in this cause. The
gist of this request is that the Court did not define
what is called an "insane delusion," and a defini-
tion is embodied in the request, and asked to be
given in charge, as follows: "An insane delusion of
the mind is an unreasoning and incorrigible belief in
the existence of facts which are untrue; a condition
of mind into which a person has not reasoned him-
self, and out of which he cannot reason himself.
And, if the jury find from the testimony in the
case that the defendant was suffering from such an
insane delusion at the time he shot the deceased,
and that the shooting was the product of such in-
sane delusion, and, if the defendant, when he shot
deceased, was acting under such insane delusion, and
such an impulse that he had no will power to con-
trol his acts, then, under such state of facts, it
would be the duty of the jury to acquit the de-
fendant."

It is urged with much zeal that such a definition

was necessary in this case, inasmuch as the theory of the defense was that defendant, when he did the killing, was suffering from an insane delusion that the deceased had been on too intimate terms with defendant's wife. It is proper to remark, in passing, if such a delusion existed, it is apparent that there was no cause or basis for it whatever, for defendant's wife is shown to be of the purest and most irreproachable character, and the delusion to be wholly without foundation, if it existed.

It is true that the Circuit Judge nowhere attempts to give to the jury a technical definition, as an abstract proposition, of what it takes to constitute an insane delusion, nor do we think it necessary that he should have done so, and an effort to do so would probably have confused, instead of aided, the jury in its deliberation.

The trial Judge's charge was full upon the question of insanity, and especially that phase or feature of it referred to as a delusion. The Judge says: "A person may be wholly or partially insane. He may have insane or false illusions, that is, be led by some false notion or hobby, and these illusions may be of such character, and have such power over and control of the mind and will of the person, as to deprive him of all power, and by an irresistible force compel him to commit a very heinous and revolting crime, thus rendering the party . wholly irresponsible for the crimes he commits, impelled and controlled by the false and insane illusions."

And again: "Insanity, in order to excuse a party for crime, must be of such a character as to deprive the person of his reason, in so far as to render him incapable of distinguishing between right and wrong, or of discerning good from evil; or the insane or false illusions must be of such a character as to deprive him of his will power, and have such control over him as to force him to do the act without the power to control his mind and will, and render him unable to resist the impulses to do the act."

And again: "If you should be satisfied that defendant did the shooting under, or by the influence of, such false and insane illusions as found him without power to resist them, or if you have a reasonable doubt of the matter, you must acquit him."

And again: "The subsequent conduct of the defendant can be looked to to ascertain whether or not defendant was insane, or acting under, or moved by insane illusions at the time of the shooting, but for no other purpose."

It is apparent from these extracts from the charge, that the trial Judge instructed the jury fully, and in a practical way, as to the meaning of insanity, and the weight to which it was entitled as a defense, and that he made prominent the feature of insane delusions or illusions, upon which counsel bases his right to relief. We think the charge did ample justice to the defendant upon his counsel's theory of the case, and is unusually full and clear upon the whole question, and is more practical than any at-

tempted technical definition could have made it. We see no error in the charge of the Court.

It is strongly pressed upon the Court that the evidence presents a case of insane delusion, and, therefore, the verdict should not be upheld. It has been pertinently said that in criminal cases the correct issue is not that of sanity, but of responsibility. 1 Wharton & Still, Med. Juris., Sec. 112. The delusions of a sane man do not make him irresponsible. Same, Sec. 142. The question is, in such cases, Is the delusion set up as a defense the delusion of an insane person? Same, Sec. 137; 3 Rice on Evidence, p. 671.

Many men of strong minds have delusions. Remarkable instances are given, in the works on medical jurisprudence, of delusions in men of prominence in all the walks of life. Lord Kenyon had an unreasoning fear of poverty, and so did Lord Stowell, although he was a man of immense fortune. His home was ababsolutely destitute of the necessities and comforts of life. Lord Erskine would never sit at a table, or reremain in company, as one of thirteen persons. Lord Eldon, after he had made up his mind and expressed his opinion lucidly and conclusively, was at all times a prey to grave doubts of his correctness. Lord Brougham, upon more than one occasion, was placed in seclusion, his mind being clearly off balance. Judge Brackenridge, of Pennsylvania, is reported to have, on a hot day, while holding Court at Sunberry, gradually taken off his clothes, until he sat

naked on the bench. Judge Baldwin, of the United States Supreme Court, was a hypochondriac. A distinguished New England Judge imagined that a dropsical affection under which he labored was a sort of pregnancy, and yet none of these men were insane, because they had reason and sanity enough to conquer and overcome these delusions. See, on this subject, Wharton & Still, Med. Jur., Secs. 34–52, and 723–743, where other cases are mentioned. A familiar illustration is that of the Mormon elders, who claim that they have a direct revelation from heaven permitting them to practice and teach polygamy. The world generally regards this a rank heresy, and the claim to be the evidence of an unreasonable delusion. It has, however, been held that they cannot defend on the ground of such delusion, inasmuch as otherwise they are sane, shrewd, active, successful, and unusually practical men in their business and social relations, and they have been held responsible for such delusions. Wharton on Criminal Law, Secs. 84, 850, 1682; *United States* v. *Reynolds*, 98 U. S., 145.

"An uncontrollable impulse of the mind, co-existing with the full possession of the reasoning powers, will not warrant an acquittal on the ground of insanity, but the question is always whether the accused, at the time he committed the act, knew its nature and character, and that it was wrong." Wharton & Still, Med. Juris., Sec. 152, Note 1.

The rule is tersely stated in Archbold, Crim. Pr.

and Pleading, as follows: ''The insanity must be of such a kind as entirely to deprive the person of reason, as applied to the act in question, and the knowledge that he was doing wrong in committing it. If, though somewhat deranged, he is able to distinguish right from wrong in his own case, and to know that he was doing wrong in the act which he was committing, he is liable to the full punishment of his criminal acts.''

The capacity to know right from wrong and to know that the particular act being committed is wrong, is recognized as a correct rule in Tennessee, to test the question of criminal responsibility. But few, if any, of the witnesses examined in this case as to the mental condition of the accused, were examined with reference to this test, but rather as to his general mental condition, based on various and different facts and circumstances. The accused is shown to have been of a proud, self-willed, arbitrary, irritable disposition, and these traits were perhaps heightened to an unusual degree by the excessive use of opiates. Still he is shown to have been able to attend to his business actively, up to the time of the homicide, and was regarded as a shrewd, intelligent, though eccentric man. Counsel have not, in view of the facts developed in the record as to his general mental condition, attempted to rest their defense upon his general mental derangement, though that feature is the one made prominent by the testimony, but they have relied on the idea that

defendant was acting under an illusion, or delusion, that the deceased was guilty of improper relations with his wife.

In the case of *The State* v. *Windser*, 5 Har., 512, the defense was delusion consisting of a belief that the prisoner's wife was untrue to him; that his children were illegitimate; that sundry conjurations were practiced on him, but the evidence showed that otherwise he was a shrewd, sensible, and wealthy business man. The Court charged the jury that if a person otherwise rational commit a homicide, through delusion on a subject connected with the homicide, he would be criminally responsible, provided he was conscious of right and wrong as applied to the act, and had the ability, because of such consciousness, to choose, by an effort of the will, whether he would commit the act or not, and this holding has been repeatedly approved.

The conduct of the defendant, in this homicide, clearly indicates that he knew he was doing a wrong and unlawful act when he did it. The killing was not the frenzied impulse of the moment when he imagined the act of infidelity occurred, but after he had talked about it to his father, and had reflected upon it, and reasoned himself out of it, until he was cured of the delusion, and then again allowed it to re-enter his mind, not as a momentary, irresistible impulse, but as a jealous suspicion, which led him to talk to the deceased for quite a time before he killed him. It cannot be that the jealous suspicions which so

many men entertain without any foundation, can be magnified into insane delusions which would exempt them from punishment for crimes originating in such jealousy. His own statement that he shot the deceased in an altercation about a cow, and for the purpose of self-defense, negatives the idea that he shot under the delusion of his wife's infidelity, so far as his statements are to be considered. His plea of self-defense, and his ingenuity and deliberation in sustaining that defense by cutting his own clothing, and by taking the knife of the deceased from his person and opening it and exposing it where it could be seen, and calling attention to it, and to his cut clothing, all indicate that he was conscious of having done wrong, and the necessity for making a plea of self-defense to avoid the consequences of an unlawful act. It was more the reason and caution of an intelligent man than the cunning of one insane.

That there was an altercation between the two men which lasted for sometime before the shooting, is evident from the testimony, and that it finally resulted in the shooting of the deceased, not as a matter of self-defense, but either to avenge a fancied wrong or as a result of jealousy, or as an act of overbearing imperiousness, is apparent. The whole matter was submitted to the jury under a proper charge. They were evidently not of the opinion that the defendant's mind was unbalanced, or that he was under such a delusion as would free him from criminality in the act. In a sense, all unfounded suspicions are

delusions, but they do not, for that reason, excuse crime.

The insanity set up as a defense in this case is not hereditary or natural, but voluntary, in the sense of having originated from the use of drugs. While this is an unfortunate and unhappy condition, the law does not, and cannot, regard it with the same leniency that it does cases of adventitious insanity, not caused by the act of the party himself. Parties who persist in subjecting themselves to the persistent use and habit of taking alcoholic drink, or other poisionous compounds and drugs, cannot expect the same forbearance and immunity from punishment as those bereft of reason by the act of God.

It is admissible and proper to show the immoderate use of drugs or whisky, not to excuse crime, but to illustrate the mental condition with a view to fixing the degree of the crime as it depends upon deliberation and cool, malicious purpose.

The jury have in this case evidently given the defendant the benefit of all that he was entitled to, on account of his condition of mind, in reducing this offense to murder in the second, instead of murder in the first degree, which, under other circumstances, could have been well supported by the facts attending this cruel and unprovoked killing, remarkable for its atrocity and want of provocation.

We see no ground of reversible error, and the judgment must be affirmed.