Atkins v. State.

CHARLES A. ATKINS *v.* STATE.[*]

(*Knoxville.*    September Term, 1907.)

1. **EVIDENCE.** Nonexpert witnesses of personal observation may give opinion as to sanity or insanity, when.

Where a nonexpert witness shows that he has had the means of observing the capacity, manner, peculiarities, or deportment of the person concerning whose sanity he undertakes to give evidence, he shows that he possesses the fundamental qualification of previous personal observation that renders him competent to give his opinion as to the soundness or unsoundness of the mind of such person. Such opinion or judgment approaches to knowledge, and is knowledge, so far as the imperfections of human nature will permit knowledge of these things to be acquired, and the result thus acquired should be communicated to the jury. (*Post, pp.* 463-472.)

Cases cited and approved: Gibson v. Gibson, 9 Yerg., 332; Norton v. Moore, 3 Head, 482; Puryear v. Reese, 6 Cold., 26; Dove v. State, 3 Heisk., 365; Wisener v. Maupin, 2 Bax., 357; Kirkpatrick v. Kirkpatrick, 1 Tenn. Cas., 258; Wilcox v. State, 94 Tenn., 110.

2. **SAME.** Same. Nonexpert witness must state the facts of knowledge of, and acquaintance with, the person whose sanity is under inquiry.

A nonexpert witness cannot give an opinion as to the soundness or unsoundness of the mind of a person concerning whose sanity he undertakes to testify, unless he gives the facts of his knowledge of, and acquaintance with, such person. (*Post, pp.* 467-471.

Case cited and approved: Wisener v. Maupin, 2 Bax., 257.

---

[*]As to what intoxication will excuse crime, see note to Harris v. United States (App. D. C.), 36 L. R. A., 465.

Atkins v. State.

3. **SAME.** Nonexpert witnesses to state the facts before giving opinion as to sanity or insanity; failure not reversible error, when.

The proper practice in the examination of a nonexpert witness as to the sanity or insanity of the accused or other person, whose sanity is under inquiry, is to require the witness to state first the facts on which he bases his opinion, though a failure to comply with this rule would not be reversible error, where the facts are stated in the course of the testimony. (*Post, pp.* 470, 471.)

4. **SAME.** Nonexpert witnesses showing acquaintance sufficient to render them competent to give opinion as to sanity or insanity.

Nonexpert witnesses who show that they had known the accused for some time, and had frequently seen and talked with him, are competent to give their opinion as to his sanity or insanity. (*Post, pp.* 463-472.)

5. **CHARGE OF COURT.** Cautioning jury against expert testimony that is not erroneous.

A charge of the court stating that while expert testimony is sometimes the only or best means to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth; and instructing the jury to receive it with caution, but to give to it such weight as they give all the other testimony, having in view a purpose to arrive at the truth, giving an impartial estimate of all the evidence, does not discriminate against the expert testimony, and is not erroneous. (*Post, pp.* 472, 473.)

Case cited and approved: Wilcox v. State, 94 Tenn., 106.

6. **HOMICIDE.** Voluntary intoxication as a defense to murder in the first degree, but not to the lower degrees, when.

Voluntary drunkenness or intoxication is available as a defense only in determining whether the accused is guilty of murder

Atkins v. State.

in the first degree or in the second degree, depending upon the fact whether the intoxication prevented the deliberation and premeditation essential to constitute murder in the first degree; but as to all subsequent inquiries, including self-defense, he must be judged by the same rules which measure the conduct of sober men, and he cannot escape conviction on the ground of intoxication causing him to think erroneously that the deceased intended to do him great bodily harm, and that he killed the deceased in self-defense, when a sober man would not have so thought and acted. (*Post, pp.* 472-490.)

Cases cited and approved: Bennett v. State, M. & Y., 133; Cornwell v. State, M. & Y., 147; Swan v. State, 4 Humph., 136; Pirtle v. State, 9 Humph., 663; Haile v. State, 11 Humph., 154; Norfleet v. State, 4 Sneed, 346; Lancaster v. State, 2 Lea, 575; Cartwright v. State, 8 Lea, 376, 385; Reniger v. Fogossa, Plowden, 19.

7. **CHARGE OF COURT.** That drunkenness aggravates the offense is a harmless error, where the jury fixed minimum punishment, when.

The court's erroneous charge to the jury that the drunkenness of the accused would not only be no excuse for his commission of the homicide, "but rather an aggravation of his offense," was not prejudicial, but harmless, where the jury found the accused guilty of murder in the second degree, and assessed his punishment at the minimum. (*Post, pp.* 475, 490, 491.)

8. **SAME.** Request for instructions covered by those given are properly refused.

A request to charge what is fully covered by the charge given is properly refused. (*Post, pp.* 477, 491.)

FROM KNOX.

Appeal in error from the Criminal Court of Knox County.—D. D. ANDERSON, Judge.

Atkins v. State.

W. L. WELCKER, JOHN C. HOUK, WILL D. WRIGHT, N. N. OSBORNE, and A. Y. BURROWS, for Atkins.

ASSISTANT ATTORNEY-GENERAL FAW, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the criminal court of Knox county at the January term, 1906, for the murder of one Edith Eckel, and was convicted and sentenced to ten years' confinement in the State penitentiary. From this judgment, after his motion for a new trial was overruled, he appealed to this court, and has here assigned errors.

The errors assigned are wholly upon the action of the court in admitting certain testimony objected to in the court below, and upon certain portions of the charge. In order, however, to a proper understanding of the points thus arising, it will be necessary to give a brief statement of the facts and of the defenses interposed.

On the night of November 1, 1905, shortly before 11 o'clock, the plaintiff in error called at the house of the deceased, and while there began dancing noisily in the hall, into which the parlor opened. In the parlor there were two other women sitting by the fire, and the deceased was sitting on a sofa in the corner of the room talking to one Charles Stephens. The deceased, having her attention attracted to the noise which the plaintiff in error was making in the hall, called out to him to de-

sist, or, to use her expression, "to cut out that dancing." Plaintiff in error replied, "I will cut it out in the hall and bring it in there." Thereupon he entered the parlor and began dancing in front of the fire. Then the deceased got up from her seat, and advanced near to the plaintiff in error, and started to put her hand on his shoulder. He thereupon fired into her breast with a derringer pistol and killed her. She had nothing in her hands at the time, except a bunch of keys and a silver dollar. Plaintiff was very drunk at the time, but immediately after shooting the deceased he left the house, shutting the front door after him. He soon afterwards appeared at the Cumberland Hotel, and left his pistol with the clerk to keep for him, telling him that he had shot a woman.

There was evidence introduced on the trial to the effect that the plaintiff in error had certain physical defects which indicated that he was a degenerate, also that his father was a hard drinker before the plaintiff in error's birth, and afterwards for a series of years; that plaintiff in error, for some ten or twelve years immediately preceding the homicide, had been addicted to strong drink, including whisky, brandy, absinthe, and every other kind of drink sold in saloons; that he had many times suffered from delirium tremens, and for two years had been affected with a chronic disease which deeply impaired his nervous system; that on the night in question he was suffering from a recent surgical operation which gave him great pain. There was also evi-

dence that he suffered greatly from the loss of sleep, and from insufficient nourishment, caused by his dissipated habits.    On the basis of these facts, hypothetical questions were submitted to several physicians at Knoxville touching his sanity.    These physicians all testified, on the hypothesis stated on the questions propounded to them, that the man was irresponsible at the time the act was committed.    On the other hand, the State introduced testimony to the effect that the plaintiff in error was a civil engineer, and was in the employ of the Southern Railway Company as such, a few weeks before the homicide, and that he had a responsible position, having two men under his direction.    There was also evidence to the effect that whatever may have been his state of degeneracy, or whatever may have been the degree of deterioration which he had reached as the result of the vicious life he had led, he knew right from wrong when he was not drinking, and that it was the effect of intoxicating liquors acting upon his enfeebled organization that brought him to an unreasoning state, when he was under the influence of these potations.    The state also introduced two nonexpert witnesses to testify as to their opinion of the plaintiff in error's sanity, from personal acquaintance and long observation of him.    The introduction of these witnesses is the first ground of objection by the plaintiff in error.

The first of these witnesses was A. A. Goolsbee.    This witness testified that in the month of November, 1905, he was a deputy sheriff of Knox county, and prior to

that time he had been assistant chief of police; that at and before the homicide he had long known the plaintiff in error, and was accustomed to seeing him every day or so, and would sometimes have a talk with him; that he had known him for fifteen years.  After he had stated these facts he was asked: "From your observation, and from your talks with him, state whether or not, on November 1, 1905, he was a sane man or an insane man."  This was objected to, on the ground that the witness was not an expert, and could not express any opinion until he had given facts on which to base it.  The objection was overruled.  The question was then repeated in the following form: "State whether or not, from your observation of Charles Atkins, over the time you have mentioned, your talks with him, and your acquaintance with him, up to November 1, 1905, Charles Atkins was a sane man or an insane man."  The same objection was made and overruled.  The witness then answered: "Well, it is a question.  I have seen Charley under the influence of liquor, or under the influence of an opiate of some kind, I don't know which.  I have seen him when he was acting under the influence of an opiate, when I didn't smell whisky on him, and outside of that time I never seen anything wrong with him—always supposed him to be a boy of good sense."  At this point counsel for plaintiff in error asked that the evidence be excluded, because it consisted of a mere opinion of the witness, and was not based on facts first de-

tailed to the jury.  The objection was overruled.  The examination then proceeded as follows:

"Q.  State whether or not, in your opinion, at this time, he was sane or insane.  A.  At what time?  Q. That is, in November, 1905.  A.  Why, I considered him sane.  (Counsel for plaintiff in error: We object to that, because he is not qualified as an expert, nor instanced his manner, conduct, and conversation before giving his opinion as a nonexpert.  No ruling.)  Q. Did you not talk to him prior to this time?  A.  Well, I lived by him three or four years down here. Q.  Would you, or not, meet him on the streets here in the city?  A.  Yes, sir; the same as I would other men. Q.  Well, what would you see him doing?  A.  I would see him coming from work, and sitting on the porch, reading the papers, just as any ordinary man would do. Q.  Do you remember any conversation you had with him at any time?  A.  Nothing in particular, no more than I would any other man that I pass and repass.  Q. Did you, or not, see him after he was in jail, charged with this killing?  A.  I don't think I saw him in jail. I saw him after he was out.  Q.  From your talks with him, and your observations of him, what you saw him doing as you have stated, state whether, in your judgment, he was a sane or insane man.    (Counsel for prisoner: We object to the question, because he has not in any manner qualified himself to answer same.  Ob-

jection overruled.) A. I consider him sane when he wasn't drunk."

The next witness on the subject whose testimony was objected to was Harmon Kreis, the sheriff of the county. This witness testified that he first became acquainted with the plaintiff in error when he was brought to the jail for confinement just after the homicide; that he saw him every day during the time he was incarcerated, running over a period of two or three months—in fact, about three months; that he had conversations with him, and had an opportunity of observing him; that plaintiff in error read a good deal; that he was sick, and that he allowed him to eat at his (the sheriff's) table, for two or three weeks; that while at table he would talk with the plaintiff in error, but never about his case; that he talked with him upon general subjects. After having made these statements, the witness was asked the following questions: "Q. Now, sheriff, state whether or not, after having observed his actions in jail, during the period you have mentioned, and having had the talks with him you have mentioned, whether or not, in your judgment, at that time, he was a sane or an insane man. (Counsel for the prisoner: We object to the question as incompetent. He has detailed no conduct, conversation, etc., upon which to give an opinion. Objection overruled.) A. Well, I wouldn't take him for an insane man. He did not act like one to me, though I am not an expert." On cross-examination the witness testified that he saw the plaintiff in error the next morning after the homicide, and perhaps had some

conversation with him, but does not remember anything that was said.  He was then asked if he could repeat any conversation he had ever had with the plaintiff in error after he was placed in jail, and he answered that he could not.

Upon the question suggested, by the exceptions above noted, there is a great array of authority.  We shall, however, refer to only two text-writers, and to our own cases.

In Elliott on Evidence, vol. 1, section 681, it is said: "There are a few decisions to the effect that an ordinary witness cannot give an opinion as to the sanity or insanity of a person; but the overwhelming weight of authority is to the effect that he may testify to the sanity or insanity of another in a proper case.  His opinion or conclusion, however, must be based upon personal observation or knowledge, and not upon hypothetical facts, nor on what he has heard from others.  It is also generally held that he must first state the facts upon which his opinion or conclusion is based.  But in the case of subscribing witnesses to a will, who testify to the sanity of the testator, it seems that they may give their opinions without first stating the particular facts on which they are based."

In Wigmore on Evidence, vol. 3, section 1917, et seq., there is an extensive discussion of the subject.  At section 1933 this author says:  "At common law, in England, there never had been any question that the opinions of lay witnesses as to sanity or insanity could be

received. Wherever a person presented himself as having had acquaintance with, and therefore observation of, a testator, or an accused person, whose sanity was in question—i. e., wherever the witness had the fundamental testimonial qualification of personal observation—no one thought of objecting on the score of the opinion rule. This plainly appears in the long list of trials in which such testimony was received. Moreover, when the opinion rule began to be discussed and formulated in the last part of the 1700's and the early part of the 1800's the judges and the treatise writers constantly named this subject as one upon which lay opinions were always and unquestionably received."

In section 1938 of the same work, at the close of the discussion, the author says: "As to the state of the law in the various jurisdictions, it is enough to note in general that laymen's opinions are to-day everywhere said to be admissible, subject to local qualifications and quibbles." Upon this follows an exhaustive note citing the cases, with their holdings from all of the states.

In our state we have several cases upon the subject: *Gibson* v. *Gibson*, 9 Yerg., 332; *Norton* v. *Moore*, 3 Head, 482; *Puryear* v. *Reese*, 6 Cold., 26; *Dove* v. *State*, 3 Heisk., 365; *Wisener* v. *Maupin*, 2 Baxt., 357; *Kirkpatrick* v. *Kirkpatrick*, 1 Tenn. Cas., 258; *Wilcox* v. *State*, 94 Tenn., 110, 28 S. W., 312; and perhaps other cases. The fullest statement of the doctrine, as now held in this state, appears in *Wisener* v. *Maupin*. In that case the question was as to the sanity of a testa-

Atkins v. State.

tor.  "After a witness," says the court, "had given the
facts of his knowledge of and acquaintance with the
testator, he was asked: 'From these facts, state in your
opinion whether or not he was of sound mind and dis-
posing memory.'  The answer is: 'He was not of sound
mind and disposing memory.'  The court allowed the
answer, so far as the statement that he was not of
sound mind, but refused to allow it, and sustained the
exception, as to the question of disposing memory."  In
holding this action of the court below correct, this court,
speaking through Mr. Justice Freeman, said:

"The question presented in the case of *Gibson v. Gib-
son* was also discussed in the case of *Norton v. Moore,*
3 Head, 482.  And the principle settled by the two cases
is that, when the witness has had the means of observ-
ing the testator's capacity, manner, peculiarities, or de-
portment, he may give his opinion as to the soundness or
unsoundness of his mind.  'Such judgment,' says Judge
Wright, in the case quoted, 'approaches to knowledge,
and is knowledge, so far as the imperfections of human
nature will permit knowledge of these things to be ac-
quired, and the result thus acquired should be commu-
nicated to the jury, because they have not had the op-
portunity of personal observation, and because in no
other way can they effectually have the benefit of the
knowledge gained by the observation of others.'  This
decision, as well as the case of *Gibson* v. *Gibson,* 9 Yerg.,
332, is based on an approval of the case of *Clary's
Adm'rs* v. *Clary,* 24 N. C., 78.  In that case, as stated

in Judge Wright's opinion (3 Head, 482), the witness
had no acquaintance with the donor, except from one oc-
currence. Eleven years before the execution of the deed
in dispute he had visited her for the purpose of writing
her will, had received her directions on the subject, and
wrote it. The witness said at this time she appeared to
him to be in good health, but he thought her intellect
in the state usually termed childish. The objection to
this testimony was that it gave the opinion of the wit-
ness upon the state of the donor's mind. This was held
competent by the supreme court of North Carolina, and,
as we have said, this case has been followed by this
court in the two cases cited; and we have no question of
the soundness of the principle. As a matter of course, the
jury should weigh the testimony in connection with the
means of observation of the witness, and his intelli-
gence, qualifying him to form a judgment; but the evi-
dence would clearly be competent. Under these rules
we can see no error in the action of his honor."

Nowhere is it held that the mere opinion of the non-
expert witness, without opportunity for observation, is
competent, and everywhere stress is laid upon the facts
coming under the observations of the witness, in order
to determine the weight of his testimony; and it has
been held in this State (*Jones v. Galbraith*, 59 S. W.,
350, 355) that in chancery cases, where the evidence is
in the form of depositions, it is not essential that the
witness, prior to the expression of his opinion, should
state the facts on which he bases that opinion, but

Atkins v. State.

that it is sufficient if these facts appear in the course of the desposition. In trials at law, where the testimony is given *ore tenus,* our cases recognize the proper practice as requiring first a statement of the facts by the witness and then the statement of his opinion. However, a failure to comply with this rule would not be reversible error, if the facts should be stated in the course of the testimony of the witness, since it is by these that the court and jury must judge of the weight and value of the opinion of the witness. It is indisputable that it should appear somewhere in the testimony of the witness that he had the testimonial qualification of previous observation of the person concerning whose sanity he undertakes to give evidence. It must appear, as a preliminary to the expression of his opinion, that he has had the means of observation. He must give the facts of his knowledge and acquaintanceship with the person concerning whose sanity he is called to testify. After having given these facts he may express his opinion. The weight of the opinion, or its value, is then developed further by evidence of the particular facts coming under his observation, and on which he bases his opinion.

On the principle stated in *Wisener* v. *Maupin,* we think the testimony of both Goolsbee and Kreis was competent. They stated the facts of their acquaintanceship and observation of the prisoner, and thus showed that they had the means of knowledge. The value or weight of their evidence depended upon the importance

of the particulars stated by them, and this was for the jury.

It is next assigned for error that the circuit judge charged the jury as follows:

"Expert and nonexpert witnesses have been allowed to testify to you as to the truth or falsity of the plea of defendant of unsound mind. This plea need not be specially written and pleaded, as the same can be set up under the general issue not guilty. In reference to the expert testimony offered you in this case, and which you should weigh and consider along with the other proof in the case, I charge you in regard to it that expert testimony should be received with caution. While expert testimony is sometimes the only means of, or the best way to, reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth. You should give just such weight as you do all the other testimony in the case, governed by a rule to arrive at the truth, giving fair and impartial estimation of all the evidence adduced in the case."

There is no error in the charge just quoted. It is substantially what was said by this court in the case of *Wilcox* v. *State,* 94 Tenn., 106, 112, 28 S. W., 312.

It is said that this portion of the charge singles out expert evidence and discriminates against it, practically telling the jury that it is without value. We do not think this an accurate criticism. The judge merely cautions the jury against the infirmities attaching to this

particular species of evidence, and he adds in the last sentence that the jury must give to it such weight as they do to all the other testimony, having in view a purpose to arrive at the truth, and being careful, at the same time, to give to this evidence a fair and impartial estimate or value, as they must do to all the evidence adduced.

The remaining assignments of error relate to other parts of the charge of the court, and to the refusal of his honor to give certain instructions to the jury, asked by the plaintiff in error, the defendant below. In order that the portions of the charge objected to may be properly understood in their relation to the context, we set out below a considerable part of the charge, noting by italics those portions which are objected to. The italics, of course, do not appear in the original charge. His honor instructed the jury as follows:

"If defendant went to the house of deceased, and willfully, maliciously, deliberately, premeditatedly, and with malice aforethought shot and killed deceased, when he was neither in danger from her of his life, or of great bodily harm, nor in fear of same, nor believed himself so, and upon reasonable grounds, then and in that event defendant, by the killing of deceased in manner and form aforesaid, committed murder in the first degree; but if defendant went to the house of deceased drunk, and to such a degree that his intoxication incapacitated him from forming a deliberate and premeditated design to kill, then defendant would not be guilty of murder in

the first degree, and his crime would be murder in the second degree.

"Voluntary drunkenness presents no excuse to you, gentlemen of the jury, for the act of homicide. It does not mitigate it. But you are not trying defendant for drunkenness, and you need only to consider it as tending to shed and throw light on his mental *status* and condition of mind at the time, in determining for yourselves, together with all the facts and circumstances, the degree of homicide, if any, defendant has committed. If, after you have fully considered all the facts, the condition of defendant's mind caused by intoxication, and whether in an excessive state of intoxication, or any degree of intoxication, it is legitimate for you to inquire whether it affected, and to what extent it influenced, the defendant in the commission of this act, and, viewed with all other facts and circumstances of the case that have been admitted and testified to in this trial, it is a proper subject for consideration; and I instruct you that, although drunkenness in point of law constitutes no excuse or justification for crime, still, when the nature and essence of a crime depends by law upon the peculiar state and condition of the defendant's mind at the time of the killing, it must claim your careful consideration. But, on the other hand, the court again will charge that in legal estimation a drunken man may be guilty as if he were sober, if it shall appear from the killing the same was willful, deliberate, malicious, and premeditated; but, if the defendant was drunk at the

time he is alleged to have committed the offense, then you say how far that drunkenness precluded the defendant, his intoxication operating on his mind, from contemplating murder in the first degree as defined herein. If it does (not), he may be guilty of murder in the second degree. *It is not claimed by the defendant, through his counsel, that the killing was committed in defense of his (defendant's) life, so that it is needless to instruct you in reference thereto further than I have already; but counsel for the defense do say and allege that at the time of the commission of the offense defendant's mind was so beclouded by liquor that by reason thereof he labored under a delusion that deceased was about to attack him (defendant) with a knife, and hence he fired the fatal shot, and I instruct you thereon that, if the delusion was the outcropping of a mind permanently diseased and unsound, then defendant would not be guilty; but if, on the other hand, that delusion was born of strong drink and intoxication at the time, then it would avail the defendant nothing, and be no excuse for the killing, but rather an aggravation of his offense. How this is you must say from the proof. . . .*

*"As between the two offenses of murder in the first degree and second degree and voluntary manslaughter, the drunkenness of the offender can form no legitimate matter of inquiry, and if the killing was voluntary, and committed under the influence of liquor either to a great or less degree, but so as to becloud and render oblivious the slayer's mind, and so as to preclude delib-*

*eration, premeditation, or murder in the first degree, necessarily it would be murder in the second degree; and if there was a provocation that was sufficient and adequate, and made by the deceased, such as a blow, it might be manslaughter. Manslaughter is defined as the unlawful killing of another without malice, express or implied. Now, if you should believe that the defendant, at the time of the slaying of deceased, was of unsound mind, incapable of knowing the right and incapable of knowing the wrong, and an irresponsible person, then you should acquit the defendant. But, if his irresponsibility grew out of and was traceable to strong drink and intoxication at the time, then and in that event his plea of insanity will not avail him. If he knew right from wrong prior to and just before the killing, but reason was dethroned by liquor at the time of the slaying, and this proof leads you to attribute his incapacity to judge of the right and understand wrong of his deeds by reason of intoxication only, the defendant could not avail himself of his plea of insanity."*

The instructions which the plaintiff in error asked the court below to charge, and which were not given, are the following:

"(1) If you believe, from the proof, that defendant, Atkins, from any cause, at the time of firing the shot causing the death of Edith Eckel, was irrational, and did not at that time know that he was doing wrong in shooting, then the defendant, Atkins, would be guilty of no

crime, and your verdict should be not guilty in this case.

"(2)   If you have a reasonable doubt, arising from the proof in the cause, whether defendant had sufficient understanding to know the nature of the act he was performing when he shot Edith Eckel, and was not able to know and understand whether he was doing right or wrong, then you should render a verdict of not guilty in this case."

"(6)   If the jury shall believe that the defendant honestly believed that, when Edith Eckel approached him, she had drawn a knife or other weapon and was about to endanger his life or do him great bodily harm, that he was then in imminent danger, then he would be guilty of no crime or any degree of homicide heretofore described, but would be acting in self-defense, and your verdict would be   not guilty."

Before considering the objection made upon the portions of the charge above referred to, and upon the refusal to charge the three requests, it is proper to say that the court below instructed the jury correctly upon the subject of the presumption of innocence. He charged upon the subject of reasonable doubt as follows:

"There is another test that inures to the safety of all defendants that you must regard, and it is this:   That the State must make out its case beyond a reasonable doubt, and this doubt obtains as to every fact and circumstance of the case, and if upon the whole case you have a reasonable doubt it should be given to the de-

fendant, and he be declared by your verdict not guilty."

Again he said: "A reasonable doubt is a doubt spring-
ing up of itself and out of the evidence, and if upon the
whole case you have such doubt you should acquit; and
if you have reasonable doubt as to the irresponsibility
of defendant you should acquit defendant, and if at the
time of the killing, or now, defendant is a person of un-
sound mind, incapable of knowing right from wrong,.
your verdict should be not guilty."

He afterwards added the following: "If you have a
reasonable doubt regarding the existence of any fact es-
sential to make out the offense charged in this case, then
you must find every such fact about which you entertain
such doubt in favor of the defendant, and exclude the
same from further consideration, and if any crime
charged in the indictment, or all of them, cannot be
made out, unless such fact shall be adopted as proven,
then of any and all offenses thus affected the defendant
must be found not guilty."

The substance of the contention of plaintiff in error's
counsel in respect of the portions of the charge and the
undelivered instructions above set out is that if the
plaintiff in error, at the time he committed the homi-
cide, was so intoxicated as the result of the use of ardent
spirits that he did not know what he was doing, or if,
owing to the intoxication, he mistook the silver dollar
and bunch of keys in Edith Eckel's hand for a knife,
and supposed, in his then besotted condition, that she
was about to stab him with a knife, he would be guilty

of no crime, first, because while in such a mental condition he could not entertain a criminal purpose, and, secondly, because he would be in the proper exercise of the right of self-defense.

The law upon this subject, as we regard it, has long been settled in this State, and but for the very earne.. and insistent presentation of the views above suggested by the eminent counsel for the prisoner we should not deem it necessary to do more than merely cite the cases. However, under the circumstances, we shall go into the matter sufficiently to recall the language of some of the cases and to state the general principle as held in this State.

We have several cases upon this subject. They are: *Bennett* v. *State,* Mart. & Y., 133; *Cornwell* v. *State,* Mart. & Y., 147; *Swan* v. *State,* 4 Humph., 136; *Pirtle* v. *State,* 9 Humph., 663; *Haile* v. *State,* 11 Humph., 154; *Norfleet* v. *State,* 4 Sneed., 346; *Lancaster* v. *State,* 2 Lea, 575, *Cartwright* v. *State,* 8 Lea, 376, 385.

In the case last cited, after reviewing the greater number of the previous cases, the court said: "The rule to be extracted from these cases is about this:    If drunkenness exists to such an extent as to render the defendant incapable of forming a premeditated and deliberate design to kill, then, of course, he cannot be guilty of murder in the first degree. Still, if the drunkenness be not of this extent, nevertheless the jury may consider the drunkenness in connection with all the facts, to see whether the purpose to kill was formed in passion pro-

duced by a cause operating upon a mind excited with liquor, not such adequate provocation as would reduce the killing to manslaughter, but nevertheless such as produced passion in fact, and reduce the killing to murder in the second degree, or whether, notwithstanding the drunkenness, the purpose to kill was formed with deliberation and premeditation, for a drunken man may be guilty of murder in the first degree if the drunkenness be not to such an extent as to render his mind incapable of deliberation and premeditation."

It is seen from this rule that the only consideration given to the fact of drunkenness or intoxication at the time of the commission of the crime of murder is to enable the court and jury to determine whether the prisoner may not be guilty of murder in the second degree, rather than of murder in the first degree.

The matter was stated more at large in *Haile* v. *State.* After referring to *Pirtle* v. *State,* the court, speaking through Mr. Justice Green said:

"Here the court explicitly lays down the rule to be that, in all cases where the question is between murder in the first and murder in the second degree, the fact of drunkenness may be proved, to shed light upon the mental *status* of the offender, and thereby to enable the jury to determine whether the killing sprung from a premeditated purpose, or from passion excited by inadequate provocation; and the degree of drunkenness which may then shed light on the mental state of the offender is not alone that excessive state of intoxication

which deprives a party of the capacity to frame in his mind a design deliberately and premeditatedly to do an act, for the court says that in the state of drunkenness referred to a party well may be guilty of killing willfully, deliberately, maliciously and premeditatedly, and if he so kill he is guilty as though he were sober.

"The principle laid down by the court is that, when the question is, can drunkenness be taken into consideration in determining whether a party be guilty of murder in the second degree? the answer must be, that it cannot; but, when the question is, what was the mental state of the perpetrator at the time the act was done? was it one of deliberation and premeditation? then it is competent to show any degree of intoxication that may exist, in order that the jury may judge, in view of such intoxication, in connection with all the other facts and circumstances, whether the act was premeditatedly and deliberately done.

"The law often implies malice from the manner in which the killing was done or the weapon with which the blow was stricken. In such case it is murder, though the perpetrator was drunk. And no degree of drunkenness will excuse in such case, unless by means of drunkenness an habitual or fixed madness be caused. The law in such cases does not seek to ascertain the actual state of the perpetrator's mind, for, the fact from which malice is implied having been proved, the law presumes its existence, and proof in opposition to this presumption

is irrelevant and inadmissible.  Hence a party cannot show that he was so drunk as not to be capable of entertaining a malicious feeling.  The conclusion of law is against him.

"But, when the question is whether a party is guilty of murder in the first degree, it becomes indispensable that the jury should form an opinion as to the actual state of mind with which this act was done.  All murder in the first degree (except that committed by poison and by lying in wait) must be perpetrated willfully, deliberately, maliciously, and premeditatedly. The jury must ascertain, as a matter of fact, that the accused was in this state of mind when the act was done. Now, according to the cases of *Swan* v. *State* and *Pirtle* v. *State*, any fact that will shed light upon this subject may be looked to by them, and may constitute legitimate proof for their consideration.  And, among other facts, any state of drunkenness, being proved, is a legitimate subject of inquiry, as to what influence such intoxication might have had upon the mind of the offender in the perpetration of the deed.

"We know that an intoxicated man will often, upon a slight provocation, have his passions excited and rashly perpetrate a criminal act.  Now, it is unphilosophical for us to assume that such a man would, in the given case, be chargeable with the same degree of deliberation and premeditation that we would ascribe to a sober man, perpetrating the same act upon a like provocation.

"It is in this view of the question that this court held, in *Swan's Case* and *Pirtle's Case,* that the drunkenness of a party might be looked to by the jury, with the other facts in the case, to enable them to decide whether the killing was done deliberately and premeditatedly."

In a very early case (*Cornwell* v. *State,* supra) the question was examined by Mr. Justice Crabbe in a very elaborate opinion. In that case the immediate subject of the court's observations was the following excerpt from the bill of exceptions showing the action of the court below:

"The court, in charging the jury, after defining the crime of murder, stated that, the fact of killing being proved, the law presumes malice; and it lies on the defendant to show, from proof, circumstances of excuse or alleviation, unless they otherwise appear. Malice is expressed or implied; and, when there is no previous grudge, it is implied when one kills another with a deadly weapon, not having been previously assaulted, in which case it is murder. You will inquire whether there was express malice, or whether there was a previous assault. If, at the time, he had not sufficient understanding to know right from wrong, and was in a state of insanity, it would be an excuse; but that must be proved. But if his insanity or unusual bad conduct arose from drunkenness, it is no excuse. There may be cases where insanity is produced by long-continued habits of intoxication; but it must be a permanent insanity. Insanity which is the immediate effect of intoxication

is no excuse.. He is equally responsible for all his acts.
The counsel for the prisoner requested the court to
charge the jury, if they believed, from all the circum-
stances of the case, that the defendant at the time of the
slaying labored under a temporary suspension of reason,
and was insane, although intoxication might have been
the exciting cause, it is a circumstance of mitigation or
excuse; and more especially if intoxication was not in-
tended at the time of drinking, but the same was acci-
dental, or a consequence not intended or apprehended.
But the court would not so charge, but said insanity
thus produced was no excuse."

In responding to an assignment that the court be-
low erred in charging as he did, and refusing to charge
as requested, Mr. Justice Crabbe said:

"Three cases of conviction for murder have been
brought before this court at the present term, in two of
which the prisoner was defended in the court below on
the ground of madness occasioned by drunkenness; and
yet in neither does it seem to us was there a colorable
foundation for such a defense. This court would be re-
miss in the performance of their duty if they did not,
under these circumstances, declare the law explicitly on
this most important subject. In the argument of these
causes very untenable positions have been assumed, and
very dangerous doctrines have been advanced by coun-
sel; and from what was stated by some of those coun-
sel, these doctrines have been repeatedly urged and
sometimes sanctioned in the courts below.

"It has become fashionable of late to discourse and philosophize much on mental sanity and insanity. New theories have been broached, and various grades and species of mania have been indicated. Some reasoners have gone so far as to maintain that we are all partial maniacs. Whatever differences of opinion there may be as to the construction and operations of the mind of man, whatever difficulty in discovering the various degrees of unsoundness, it is only necessary for us to ascertain the kind of prostration of intellect which is requisite to free a man from punishment for crime by the law of the land. It is with this alone we have to do. 'What the law has said, we say. In all things else we are silent.' We put our feet in the tracks of our forefathers. 'Non meus hic sermo, sed quae praecepit Offellus.' Let us, then, for a moment resort to the sages of the law of different ages, and learn from them whether that species of frenzy which is produced by inebriety constitutes any excuse for crime and what sort of insanity it is which will serve this purpose.

"The good and the great, the humane yet firm, Sir Matthew Hale, in his History of the Pleas of the Crown, divides madness (dementia) into three kinds—idiocy, accidental or adventitious madness, and drunkenness. 'The second species, when it amounts to a total alienation of the mind, or perfect madness, excuses from the guilt of felony and treason; and further, persons afflicted with accidental madness, whether temporary (as in the case of lunacy) or continued, if they are totally

deprived of the use of reason, cannot be guilty ordinarily of capital offenses; for they have not the use of understanding, and act not as reasonable creatures, but their actions are, in effect, in the condition of brutes.'

" 'The third sort of madness is that which is dementia affectata, namely, drunkenness. This vice doth deprive men of the use of reason, and puts many men into a perfect, but temporary, frenzy; but by the laws of England such a person shall have no privilege by this voluntarily contracted madness, but shall have the same judgment as if he were in his right senses.'

"In the case of *Reniger* v. *Fogossa,* in Plowden, 19, we have a rule laid down, which has been approved again and again, from the early day in which it was advanced to the present time, 'that, if a person that is drunk kills another, this shall be felony, and he shall be hanged for it; and yet he did it through ignorance, for when he was drunk he had no understanding or memory; but inasmuch as that ignorance was occasioned by his own act and folly, and he might have avoided it, he shall not be privileged thereby.' Here we have the strongest case put—a case of a total deprivation of understanding by drunkenness. Yet it is held to form no excuse.

"Lord Coke, in his Commentaries (page 247a), says: 'As for a drunkard, who is voluntarius dæmon, he hath no privilege thereby; but what hurt or ill soever he doth, his drunkenness doth aggravate it.' And we are told in *Beverly's Case,* 4 Rep., 125, 'that although he

who is drunk is for the time non compos mentis, yet his drunkenness doth not extenuate his act or offense, nor turn to his avail.'

"Hawkins, in his Pleas of the Crown (book 1, c. 1, section 6), says 'that he who is guilty of any crime whatever through his voluntary drunkenness, shall be punished for it as much as if he had been sober.' The erudite commentator on the laws of England writes as follows on this subject (4 Black., chs. 25, 26) : 'As to artificial, voluntarily contracted madness, by drunkenness or intoxication, which, depriving men of their reason, puts them in a temporary frenzy, our law looks upon this as aggravation of the offense rather than as an excuse for any criminal misbehavior. The law, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, though real, will not suffer any man thus to privilege one crime by another.'

"But the part of the judge's charge which is most earnestly objected to is in the following words: 'There may be cases where insanity is produced by long-continued habits of intoxication, but it must be a permanent insanity.'

"It has been already stated by us that madness, or insanity, if the term be preferred, occasioned immediately by drunkenness, does not excuse. Yet the judge correctly says 'that if, by means of drunkenness, a permanent or, as Lord Hale to the same effect expressed it, if habitual or fixed, madness be caused, that it will excuse.' See Hale, P. C. pt. 1, ch. 4.

"In the above extracts we see the law in this respect. A contrary doctrine ought to be frowned out of circulation, if it has obtained it, by every friend to virtue, peace, quietness, and good government. The history of criminals and criminal trials shows that he who has not learned betimes to restrain the evil inclinations of our nature—envy, malice, revenge, and their kindred passions—but has a sufficiency of moral sense left to deter him from the commission of enormity while sober, will often 'screw his courage to the sticking point' by the free use of ardent spirits, and, thus made able to silence the twinges of his conscience, will voluntarily imitate the demon. But let courts once approve the doctrine now contended for, and it will not be resorted to as a plea by persons of this description alone; but even the cold-blooded calculating assassin will never be a sober homicide. He will always exhibit himself at the bar of a court of justice as a specimen of insanity produced by drunkenness. And thus this degrading and disgraceful, yet too common, vice, instead of being hunted from society as the bane of good morals and social and domestic happiness, will be converted into a shield to protect from punishment the worst of crimes. All civilized governments must punish the culprit who relies on so untenable a defense; and in doing so they preach a louder lesson of morality to all those who are addicted to intoxication, and to parents and to guardians, and to youth and society, than 'comes in the cold abstract from pulpits.'

"In order to be clearly understood, we have supposed the strongest case—a case of entire prostration of intellect immediately occasioned by drunkenness—and have said that that constitutes no excuse.   Instances, however, of heinous offenses, committed under such circumstances, are believed to be of rare occurrence.   They are much oftener the result of that midway state of intoxication which, although sufficient to stimulate the evil-disposed to actions correspondent with their feelings, would not excite the good man to criminal deeds. It is generally the drunken man acting out the sober man's intent.   He says and does when drunk what he thinks when sober."

The foregoing observations set forth in the strongest manner the fallacy of the contentions insisted upon by the prisoner's counsel in the present case, and show how impossible it is, how contrary to the sound policy of the law, and how destructive to public peace and public order, such doctrines would prove, if they should be permitted to gain a foothold in our courts.

It is true that in none of these cases cited was there any question raised as to a misapprehension the prisoner might be under as to the hostile intentions of the party killed; such misapprehension arising solely from the besotted condition of his mind produced by voluntary intoxication.   But the principles enunciated cover this phase of the matter fully.   After the inquiry is passed as to whether the accused party is guilty of murder in the first degree or murder in the second de-

gree, no further consideration, under our authorities, is given to the fact of his intoxication. As to all subsequent inquiries he must stand at the bar of justice and be judged by the same rules which measure the conduct of sober men. Indeed, the consequences that would follow any other view are horrible to contemplate. If it be true that the red-handed murderer can say to the court, and be thereby excused, "I killed the man I am accused of killing, because I was very drunk, and did not know what I was doing," or "I supposed, without any foundation in fact, but simply because I was drunk, that he was going to do me great bodily harm, and therefore I killed him," truly the quiet and peaceable and orderly members of every community in the State would be at the mercy of the drunken, the disorderly, and the brutal, and the courts would be powerless to check the quick and certain descent of social order into chaos and ruin. No such license to commit rapine and murder can be issued to vicious, drunken, and besotted men.

It is insisted that at all events the judge of the court below committed error in saying to the jury that drunkenness would not only be no excuse for the commission of the homicide "but rather an aggravation of his offense." This was an incorrect expression on the part of the circuit judge, as held in *Haile* v. *State,* supra, at page 158 of 11 Humph., next to the last paragraph of the opinion. However, no injury was done to the prisoner by this remark, because the jury gave him the very lowest term they could give him, after finding him

Atkins v. State.

guilty of murder in the second degree.  The statute prescribed as a punishment for that offense confinement in the State penitentiary for a period of not less than ten nor more than twenty years.  The jury gave him only ten years.  The verdict was a very merciful one. The subject-matter of the second request was fully covered by the charge of the court.

There is no error in the judgment of the court below, and it must be affirmed.