J. B. FISHER *v.* TRAVELERS' INSURANCE COMPANY. *

(*Jackson.* April Term, 1911.)

1. EVIDENCE.   Of experiments tending to show that accident
   could not have happened as contended is competent and ad-
   missible, and its exclusion was reversible error.

Where, in a suit on an accident policy insuring the decedent
   against death from "bodily injuries, effected directly and inde-
   pendently of all other causes, through external, violent, and
   accidental means   *   *   *,   while   riding   as   passenger   and
   being in or on any" such car as that on which the accident
   happened, the complainant contended that the insured's death
   resulted from injuries by being thrown against the seats of
   the car by its motion and swerve when rounding a curve, while
   the defendant claimed that the motion and swerve of the car
   when rounding the curve could not have caused a person to
   fall as the deceased did, and that her fall resulted from her
   physical condition, evidence of the result of experiments made
   by witnesses with the same car in going around the same
   curve at various rates of speed from two to ten miles, indicat-
   ing or tending to show that the motion and swerve of the
   car would not disturb the balance of any person walking the
   aisle as the insured was unless the curve was rounded at
   comparatively high speed, and then it would cause a person to
   fall in the direction opposite to that in which it was contended
   by complainant that the insured fell, was competent and ad-
   missible, and its rejection or exclusion was reversible error.
   (*Post, pp.* 462-473.)

Cases cited and approved:   Boyd v. State, 14 Lea, 161; Lipes v.
   State, 15 Lea, 125; Railroad v. Ayers, 16 Lea, 725; Byers v.
   Railroad, 94 Tenn., 345 (and citations); Railroad v. Champion
   (Ind.), 32 N. E., 874, 23 L. R. A., 861.

---

*Experiments in presence of jury, see note in 15 L. R. A., 221.

Fisher v. Insurance Co.

2. **CHARGE OF COURT. Proper as to failure of complainant to testify about matters peculiarly within his knowledge.**

In a suit on an accident policy for the accidental death of the complainant's wife, based upon the alleged ground that she died as the result of being thrown against the seats of a street car as it was rounding a curve, it was shown that complainant was a physician; that he and his wife did not live happily together; that shortly before her death, another physician, who had been attending her, had visited her, and she then showed no dangerous symptoms, but soon after he left, while complainant was alone with her, her pulse began to decrease, and she died soon thereafter; that, in a prior action against another insurance company to recover upon a policy on her life, complainant had testified, and had been cross-examined at length, and his misconduct and unfaithfulness to his wife was disclosed; that failing to offer himself as a witness in the present suit, the defendant proved parts of his testimony in the former case, showing facts which complainant alone could explain, and which tended to show a motive for ridding himself of his wife; whereupon the court properly charged the jury, substantially, among other things, that the failure to call an available witness possessing peculiar knowledge as to essential facts, especially if such witness would naturally be favorable to the party's contention, raises an inference, sometimes denominated a "strong presumption of law," that the testimony of such uninterrogated witness would not sustain the contentions of the party, and that such rule applied with peculiar force to a party to a suit who refuses to testify, and was applicable to complainant. (*Post, pp.* 473-483.)

Cases cited and approved: Dunlap v. Haynes, 4 Heisk., 476, 480; Jackson v. Blanton, 2 Bax., 63, 66, 67; Bennett v. Insurance Co., 107 Tenn., 371; Standard Oil Co. v. State, 117 Tenn., 676; Railroad v. Ellis, 54 Fed., 481, 483, 4 C. C. A., 454, 456; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 Fed., 180, 36 C. C. A., 135; Blatch v. Archer, Cowp., 63, 65.

3. SAME. Improper as to failure of complainant to testify about matters peculiarly within his knowledge, though his former testimony was proved, when.

After delivering a proper charge as stated in the preceding head-note, the court then improperly charged the jury, substantially, that if the jury believed that complainant's testimony, taken on the trial of a former case, contained all the evidence within complainant's knowledge which was favorable to defendant, the jury should take that into consideration, since it was not right that the defendant should introduce all the testimony of complainant against his interest and in favor of defendant, and then, in addition. have the full benefit of the presumption against him arising from his not testifying. This charge was erroneous, because there were other facts proven in the record, as to which complainant might have testified, than those contained in the cross-examination, and proved by the record in the previous case. (*Post,* pp. 473-483.)

4. SAME. Proper as to presumptions against a complainant fail-ing to testify and to explain facts peculiarly within his knowl-edge and seemingly adverse to him.

Where, in a suit on an accident policy for the accidental death of the complainant's wife, complainant failed to testify, notwith-standing the proof of facts showing that he must have had peculiar knowledge of many facts, not known to others, con-cerning his wife's death, tending to show that her death was not caused by an accident in the meaning of the policy but imputing to him her death, it was proper to charge the jury that his failure to testify was unaccountable upon any other reasonable hypothesis than that he could not deny the truth-fulness of the testimony given against him as to his conduct about the time of his wife's injury and death, and as to the admissions made by him at a former trial of another case. (*Post,* pp. 483-489.)

Cases cited and approved: Dunlap v. Haynes, 4 Heisk., 476; Jackson v. Blanton, 2 Bax., 63; Bennett v. Insurance Co., 107

Fisher v. Insurance Co.

Tenn., 371; Dick Co. v. Belke Co. (C. C.), 86 Fed., 149; Societe, etc., v. Allen, 90 Fed., 815, 817, 33 C. C. A., 282, 284; Bank v. Stone, 50 Me., 595, 599; Dickinson v. Bentley, 80 Iowa, 482.

5. **EVIDENCE. Litigants are not excused from testifying because of the humiliation to which they may be subjected on cross-examination.**

Where, in a suit on an accident policy for the accidental death of the complainant's wife, the defendant proved facts tending to show or to justify an inference that complainant caused her death, and consequently that her death was not caused by an accident within the meaning of the policy, it was not a sufficient explanation of complainant's failure to testify that he shrank from the humiliation of having to repeat his infidelities to his wife and other discreditable conduct on his part at the time of and during their marriage, as he had been compelled to do on cross-examination in a former action upon a policy on his wife's life in another insurance company. (*Post, pp.* 473-489 and especially 489.)

6. **CHARGE OF COURT. Special request for instruction as to failure of a party to testify that is too strong and too direct, and that invades the province of the jury, is properly refused; suggested modification.**

Where, in a suit on an accident policy for the accidental death of the complainant's wife, the defendant specially requested the court to charge, in substance, that it is the duty of a party to a suit in a court of equity to make a disclosure of all material and relevant facts in his possession bearing upon the issues, and to withhold none, so that the merits of the controversy may be fairly and properly determined; that plaintiff is a competent witness, and has not testified; and that his failure to testify is unaccountable upon any other hypothesis than that he could not deny the truthfulness of the testimony given against him as to his conduct about the time of his wife's injury, and as to his admissions at the former trial; nor can his failure to testify concerning the symptoms, conditions, and

appearance of his wife, after the injury, be accounted for upon any other reasonable ground, except that, if he testified, his testimony would have tended to disprove that her death resulted from accidental means, such request is stated in language too strong and too direct, and, if given, would have invaded the province of the jury, and it was, therefore, properly refused. An instruction might have been properly given that the jury would be justified in presuming against complainant, and in assuming as true the facts which he might have disproved by his own testimony if untrue, if they should see proper to do so. (*Post, pp.* 484, 489, 490.)

7. SAME. As to complainant's right to recover notwithstanding his bad character and motives, if he made out a case of accidental death of his wife under an accident policy, is not improper, when.

Where, in a suit on an accident policy for the accidental death of the complainant's wife, the court instructs the jury that if they find evidence tending to show discord between complainant and his wife, his bad treatment of her, immoral conduct on his part, his forgery of her will, or that he was guilty of other wrongful conduct, they can consider said evidence as part of the circumstances surrounding and preceding her death, in determining the cause of her death; but that, if the jury conclude, from the preponderance of the evidence, that the injury received on a street car, directly and independently of all other causes, through external, violent, and accidental means, resulted in and caused her death, then the jury should not allow any prejudice against complainant, by reason of evidence reflecting on his character, to affect the verdict; and if the jury believe from the proof that complainant's character is bad, they may consider this as bearing on the probability or improbability of bad conduct on his part, and as bearing on the question whether he was impelled by good or bad motives; but if he has made out his case by a preponderance of the proof, he is entitled to recover, no matter how bad his character may be, such instruction, when fairly construed, means that the

Fisher v. Insurance Co.

jury should consider all the facts proven, in determining where the preponderance of the evidence lies as to the cause of death, and is not objectionable as segregating the testimony introduced by the defendant as to the probable cause of the decedent's death from that part of the testimony which immediately concerned the alleged accident in the car, and as authorizing the jury to consider the latter evidence apart from the former in reaching their conclusion as to the cause of the death. (*Post, pp.* 490, 491.)

8. SAME. Correct as to consideration of testimony as to forgery of will in husband's suit upon accident policy for accidental death of his wife.

Where, in a suit on an accident policy for the accidental death of the complainant's wife, evidence was introduced which tended to raise an inference that complainant had caused his wife's death, and also that he had forged her will, an instruction that testimony with reference to the forgery of the will was material only as a part of the circumstances surrounding and antedating his wife's death, and as bearing upon the question of what, if any, motive complainant had to cause her death, and could be considered only in that connection, was correct, and not improper. (*Post, pp.* 491, 492.)

9. SAME. Immaterial instruction likely to mislead jury should not be given.

Where, in a suit on an accident policy for the accidental death of the complainant's wife, the defendant contended that complainant himself caused his wife's death, and had forged her will in his own favor covering certain lands of hers in the State of Mississippi, an instruction was given to the jury, in effect, that, under the law of Tennessee, a will must be proved and recorded, and letters testamentary granted, in a court of the county where the testatrix had her residence at the time of her death, and that if the jury find that her will was proved and recorded in a certain county where she resided at her death, then that would be the legal way of proving the will,

Fisher v. Insurance Co.

and no inference derogatory to complainant can be drawn from his proving it there, though she may have had lands in Mississippi, such instruction was immaterial, and should not have been given, because it was of a nature likely to mislead the jury. (*Post*, *pp.* 491, 492.)

10. SAME. Same. As to law of inheritance of another State as argument against forgery of will is improper where alleged forger is not shown to have known such law.

Where the court, continuing the charge stated in the preceding headnote, instructs the jury that under the laws of Mississippi, where a wife dies leaving no children, the husband, by virtue of the marital rights, and independent of any will, inherits the real estate of his deceased wife, and therefore that it is immaterial whether said will was proved in Mississippi, or not, in so far as his inheritance of such real estate is concerned, such instruction was improperly given, because there was no evidence or presumption that complainant knew what the law of Mississippi was when the will is said to have been forged by him; for the existence of such law, when not known to him, is no argument against his forging the will. (*Post*, *pp.* 491, 492.)

11. EVIDENCE. Expert's copy of signature is no evidence that a less skilled person could copy it; and exclusion of such evidence is not error.

Where, in a suit on an accident policy for the accidental death of the complainant's wife, it was contended by defendant that complainant had forged his deceased wife's will, the fact that a controversy arose between counsel as to whether a forged signature should resemble the original in order to be a deceptive forgery did not authorize the admission of a copy of decedent's alleged signature, made by a handwriting expert, and offered by defendant as an illustration of the ease with which the decedent's name could be forged, to show the expertness of the witness, and in support of defendant's theory as to how the signature was forged with an indelible pencil, which the expert used in making the illustration, and there was no error

Fisher v. Insurance Co.

in the court's exclusion of such evidence; for the expert's imitation of the signature would be no reason for believing that any other less skilled person could make a similar imitation with equal ease, and, therefore, the evidence was wholly immaterial and irrelevant. (*Post, pp.* 492, 493.)

12. **CHARGE OF COURT. As to medical treatment and autopsy that is not erroneous as eliminating other evidence, especially in the absence of a special request thereon.**

Where, in a suit on an accident policy for the accidental death of complainant's wife, the defendant claimed that she died from the result of drugs administered to her in the course of medical treatment, and not from the result of an accidental injury, as claimed by complainant; and the court charged that the evidence showed, after it was claimed that the insured was injured, that morphine and other poisonous drugs were given her in the course of medical treatment; that it was immaterial whether such treatment was proper or improper, or whether, it was the intention of saving or prolonging life, but if the jury found from the evidence that such medical treatment caused or in any wise contributed to or acted in conjunction with the injuries to bring about her death, or hastened her death, there could be no recovery; and further instructing the jury, the court said "You may, however, consider whether or not the said medical treatment was in accord with the practice of reputable physicians, and. if you find it was, you may look to this in determining whether or not said medical treatment contributed to or hastened her death;" and after giving instructions on another subject, the court then also charged that the purpose of an autopsy is to ascertain the exact cause of death, and that the chemical analysis of the contents of the stomach of the insured decedent was for the purpose of ascertaining whether or not there was any poisonous substance therein, so if the jury found that an autopsy was made on defendent's body by competent physicians and chemists, and no morphine was found therein, then they might

consider such facts determining whether or not she came to her death by morphine poisoning, accidental or otherwise, or as the result solely of the accident, the said instruction on autopsy and the quoted portion of the preceding instruction were not erroneous as eliminating other evidence that the decedent's stomach, from the time of her alleged injury to her death, was torpid and unresponsive, and that under such circumstances morphine, even in small doses by hypodermic injections, would probably be fatal, though it might not be disclosed by a post mortem examination and analysis of the contents of the stomach, in the absence of a special request presenting such phase of the testimony. (*Post, pp.* 493-499.)

13. **SAME.** **That expert evidence must be received with "great caution," and that the jury "must not be misled or confused" thereby, is erroneous, as discriminating too strongly against expert evidence.**

A charge instructing the jury that they must receive and consider expert testimony with great caution; that they must make a careful and painstaking investigation of all the facts, with the view of reaching the truth, and must not be misled or confused by expert testimony, because, while such testimony is sometimes the only means or the best way to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth, was erroneous, as discriminating too strongly against such class of evidence in warning the jury that they "must not be misled or confused by expert testimony," and also in charging, in respect of all of the expert testimony in the case, that it must be received with "great caution." (*Post, pp.* 499-506.)

Cases cited and approved: Persons v. State, 90 Tenn., 291; Wilcox v. State, 94 Tenn., 106, 112; Bateman v. Ryder, 106 Tenn., 712, 715; Atkins v. State, 119 Tenn., 458, 472.

Fisher v. Insurance Co.

14. **SAME. That the nonexistence of one fact in a hypothetical question asked an expert renders his opinion valueless contains no error.**

A charge instructing the jury that, in weighing the answers of experts to hypothetical questions, they must look to all the evidence, and determine whether the facts, supposed to exist in the hypothetical questions asked, did actually exist, "because, if one fact, supposed to be true, included in the hypothetical question, is untrue, that is, not supported by the evidence, then the opinion of the expert would be valueless," and because the expert witness gives his opinion upon a certain state of facts supposed to be true, and it cannot be known what his opinion would be if one of those facts was withdrawn, is in substantial accord with the authorities, and contains no error. (*Post, pp.* 506-508.)

15. **SAME. That presumptions might be overcome by facts and circumstances which "establish" the contrary contains no reversible error in the use of the word "establish."**

Where, in a suit on an accident policy for the accidental death of the complainant's wife, the court charged the jury that the complainant was entitled to the presumption that his wife did not commit suicide, and that she was not murdered by him or any one else; that each of these presumptions might be overcome by facts and circumstances which "establish" the contrary; but that such presumptions stand until they are overcome by the preponderance of the evidence, sufficient for that purpose, does not contain reversible error, because of the use of the word "establish," when taken in connection with the rest of the paragraph, though its such use in a civil case is unfortunate. (*Post, pp.* 508, 509.)

Cases cited, distinguished, and approved: Insurance Co. v. Bennett, 90 Tenn., 256; Knights of Pythias v. Steel, 107 Tenn., 1, 7, 11.

16. SAME. Same. Requiring the establishment of a fact to the satisfaction of the jury is improper as requiring too high a degree of proof.

A charge that it was incumbent upon a party "to establish the fact to the satisfaction of the jury" is equivalent to saying to them that he must make it appear beyond a reasonable doubt, and is, therefore, improper as applied to the party upon whom the burden of proof rests in a civil case, in that it requires a degree of proof entirely too high. (*Post, pp.* 508, 509.)

Cases cited, distinguished, and approved: Insurance Co. v. Bennett, 90 Tenn., 256; Knights of Pythias v. Steel, 107 Tenn., 1, 7, 11.

17. ACCIDENT INSURANCE. Evidence stated and held to be insufficient to prove the fact that proofs of death were sent to the insurer.

Where, in a suit on an accident policy for the accidental death of the insured, the insurer's agent testified that he could not say whether proofs of death were handed into his office or sent directly to the insurer, without examining his record, such evidence did not show that the proofs were sent either to the office of the agent or to the office of the insurer, especially where such agent testified that he was not in his office at the time the alleged accident occurred, and did not know whether any notice had been sent there or not, and did not profess to know what was on the records of the insurer at the home office, where the notice was required to be sent; and there was no other evidence upon the subject, except a physician testified that he made out the proofs of death, but had no knowledge as to whether they had been sent to the insurer; such evidence cannot be taken as sustaining in any sense the fact that the proofs of death were sent as required by the policy. (*Post, pp.* 510, 511.)

18. **CHARGE OF COURT.** Special request for instruction to jury to find that proofs of death were not furnished as required by accident policy should be given, when.

Where, in the case shown in the preceding headnote, if nothing else appeared, and there was no waiver of proofs of death, a special request for an instruction to the jury that there was no evidence that the proofs were furnished in the manner required by the policy, and that they should find accordingly, should have been given; but where such proofs of death were waived by the insurer's demand for an autopsy such request was properly refused. (*Post, pp.* 510, 511, 512.)

19. **ACCIDENT INSURANCE.** Policy requiring proofs of death to be sent to home office is not complied with by submitting same to office of local agent.

Where an accident policy requires proofs of death to be sent to the insurer's home office, this requirement is a condition precedent to a recovery, unless it be waived; and submission of such proofs to the office of a local agent of the insurer is not a compliance with such requirement. (*Post, pp.* 511, 512.)

20. **SAME.** Insurer's demand for autopsy waives proofs of death.

The insurer's demand for an autopsy to discover the cause of death constitutes a waiver of the proofs of death required by the policy as a condition precedent to a recovery. (*Post, p.* 511.)

21. **ASSIGNMENT OF ERROR.** For refusal of new trial for newly discovered evidence will not be considered where the case is reversed upon other grounds resulting in a new trial.

It is unnecessary for the supreme court to consider an assignment of error based upon the refusal of the trial judge to grant a new trial on account of newly discovered evidence, where the case must be reversed upon other grounds, resulting in a new trial, and such newly discovered evidence may be introduced at the next trial, if then deemed material. (*Post, p.* 512.)

Fisher v. Insurance Co.

22. ACCIDENT INSURANCE. Reception and retention of premiums operates as a waiver of insured's signature to certificate, and estops insurer to object for want of same.

Where a beneficiary supplement, insuring the complainant's wife against accident in his favor, was attached to an accident policy issued to complainant, and the premium was received and retained by the insurer, without requiring the wife's signature to the certificate, such beneficiary supplement having been lost, and a new one issued in lieu thereof, the insurer was estopped to object to the validity thereof, upon the ground that it was not signed by the wife in person, but by plaintiff for her; and a charge of the court in accordance with this view, and the court's refusal to charge special requests contrary to such view, constituted no error. (*Post, pp.* 512-515.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.— F. H. HEISKELL, Chancellor.

CARROLL & McKELLAR, for complainant.

FITZHUGH & BIGGS and CANADA & PHELAN, for defendant.

MR. JUSTICE NEIL delivered the opinion of the Court.

The complainant, J. Baxter Fisher, procured of the defendant an accident insurance policy in the sum of $10,-000 on the 5th of November, 1906. This policy contained

Fisher v. Insurance Co.

the usual clauses with respect to accidents producing a partial injury, and also a provision that, in event of death, the principal sum should be paid to his wife, Lula A. Fisher, if surviving; otherwise, to the executors, administrators, or assigns of the insured. This policy is known in the record as "D34802." Attached to it was what is called a beneficiary supplement, in which the life of the wife was insured against accidents. This provided that, in case death should occur to the wife from "bodily injuries, effected directly and independently of all other causes, through external, violent, and accidental means (suicide, sane or insane, not included), while riding as passenger and being in or on any railway passenger car using steam cable, compressed air, or electricity as a motive power, or while in a passenger elevator, or while traveling as a passenger on board a steam vessel licensed for the regular transportation of passengers, or caused by the burning of a building" while the wife was therein, $10,000 should be paid to the husband, J. Baxter Fisher. For injuries not resulting in death, this supplement provided that money accruing under the policy should be paid to the wife. On the 16th of June, 1907, the complainant took out another policy of accident insurance on his own life in the sum of $5,000. This policy also provided that, in the event of death, the principal sum of $5,000 should be paid to the wife, Lula A. Fisher. It is known in the record as "E33739." There was prepared to go with this policy a beneficiary supplement on the life of the wife. Its terms are similar to

those contained in the supplement already referred to, except the sum expressed, that is, $5,000, instead of $10,000, and except this clause: "That the beneficiary signs consent below to the insurance herein given, and warrants all the following statements to be true." The follow statements as to her age, weight, and residenc that J. Baxter Fisher is her husband, and her occupatᵢ that of housewife; that she has no other accident insᵣ ance, except that in the former policy; that she iₙ ₁ sound condition mentally and physically, and eˣ ₀t the following at the close of the paper: "I consent hereto, and warrant the above statements to be true." Then follows a blank space for the signature. Under this are the following words: "Beneficiary under this supplement." This supplement is known in the record as "Beneficiary Supplement No. 82887." It is dated May 20, 1907, while the policy to which it was intended to be attached is dated, as we have already said, on the 16th day of June—at least, the policy was to begin on the 16th of June, according to its terms. The supplement provided that the insurance under it shall commence "on the date below." The date below is the 20th day of May, 1907. The supplement was countersigned by Paul B. Jefferson, one of the agents of the company, and handed to J. Baxter Fisher. Mr. Jefferson says in his deposition that he handed it to him to be signed by the wife and returned for attachment to the policy. On cross-examination says he does not remember this, but he so states from his usual course of business. He, however, did

hand it to J. Baxter Fisher. Subsequently, on July 16, 1907, the following paper was handed to the company. In the meantime Paul B. Jefferson had ceased to be its agent. It is on the letter head of the company's office at Memphis, and reads as follows:

"Agency at Memphis, Tennessee,

"July 16th, 1907.

"We, J. Baxter Fisher and Lula A. Fisher, hereby certify that Beneficiary Supplement No. 82887, issued through the agency of Marks & Bensdorf, district managers, Memphis, Tennessee, on the life of Lula A. Fisher, has been lost, mislaid, or destroyed, and that the same is not now in force, and in consideration of $1.00 to us in hand paid, the receipt of which is hereby acknowledged, we hereby agree to hold the Travelers' Insurance Co., of Hartford, Conn., harmless from all or any claims or liability under said beneficiary supplement; and it is further agreed that, in case said beneficiary supplement should be found at any time, it shall be at once forwarded to the office of the company in Hartford, Conn.

"[Signed]    Lula A. Fisher, Assured.

"J. B. F.

"Witness: F. H. H."

Three days before the date of the paper just quoted—that is, on the 13th of July, 1907, there was issued another beneficiary supplement in the place of No. 82887, and known in this record as "Beneficiary Supplement No. 96377." It contained the same provisions as No.

124 Tenn.—30

82887, as to the signature of the wife. It was counter-signed by Paul B. Jefferson, but not until after he had left the service of the company. However, Mr. Bensdorf, one of the district managers of the company at Memphis, testified that this was issued in lieu of No. 82887, and that the premium on the latter had been paid, and had never been returned. This purports to be signed by Lula A. Fisher, but there was evidence that her name was written by J. Baxter Fisher himself. The suit was first brought on No. 82887, and by subsequent amendment No. 96377 was added. It appears that No. 82887 turned up before the suit was brought. This explains issues 2 and 3 referred to in the charge of the court to the jury, which will be mentioned in the course of the opinion.

A jury was called for by the complainant, and issues were submitted to them. These issues need not be referred to more particularly than they are set out below in disposing of the charge of the court.

There was a verdict for the complainant for the full amount of both supplements and interest, and the defendant, after its motion for new trial had been overruled, appealed to this court, and has here assigned errors.

The first assignment of error is based on the refusal of the trial judge to permit the witnesses Caruthers Ewing, Henry J. Livingston, H. R. Miller, J. I. Foster, and T. N. Gorham to testify before the jury as to the experiments made with the same street car on which the alleged

accident occurred at the same curve, and under substantially the same conditions as those which existed at the time of the alleged accident, as tending clearly to show that the deceased, Lula A. Fisher, could not possibly have been injured in the manner alleged in the bill, and as claimed by the complainant's witness Leibkeman, and the exclusion, over the defendant's objections, all the testimony of said witnesses.

As set out in another portion of defendant's brief, the defendant offered evidence of the witnesses referred to, in substance to the effect that experiments were made with the same car at the same curve, and under substantially the same conditions that existed at the time of the alleged accident, which tended to show that it was physically impossible for any swerve of the car, while going east around the curve in question, to cause a person walking in the aisle to the rear to fall towards the north, or to the side; that these experiments were made with the car running at various speeds, and the witnesses testified that in going at only three or four miles per hour around the curve it would not disturb the balance of any one while walking in the aisle; but when running at a high rate of speed the effect upon a person so walking towards the rear, exactly as Mrs. Fisher was doing, and in the same part of the car, was invariably the opposite of Leibkeman's testimony; in other words, that, where there was the slightest tendency to fall, it was invariably towards the left, that is, towards the outside of the curve, or the direction in which the car was going before it

struck the curve, which constituted a partial obstruction.

Dr. Leibkeman testified that he was on the same car on which Dr. Fisher and his wife were riding at the time the accident is said to have occurred; that when the car was near the place where Dr. Fisher and his wife were to stop, Mrs. Fisher, who was sitting near the end of the car, perhaps the second or third seat from the back of the car, rose to walk out, and had gotten in the aisle of the car, and was going towards the back of the car, and that the car made a swerve, and she fell or was thrown upon the railing of a seat in front of her, and sank to the floor with her hands or arms on the end of the seat, and was picked up by her husband and carried from the car when it stopped. It is shown that the swerve was made at the curve. It appears from the evidence that the car was going in a southeast direction, and that the curve in the track was to the south, and hence that the swerve must have been to the south. It appears from the testimony of Dr. Leibkeman that she fell to the north, and that the alleged injury upon which the action was brought, and which is said to have caused the death of Mrs. Fisher, was to the right side; it being claimed that four ribs were broken, and that she died from the shock caused by this injury. The evidence of the motorman of the car is that the car was going three or four miles an hour at the time Mrs. Fisher fell. Now, it is, of course, possible that Mrs. Fisher may have had a sudden fainting spell, and have fallen upon the rail-

Fisher v. Insurance Co.

ing of the seat, without being thrown thereon by the motion of the car. However, the contention of the complainant in the court below was that she was so thrown by the swerve of the car, and there was no evidence that she had fainted, further than might have been inferred from the mere fact of her falling. Since the case went before the jury upon the theory of the swerve of the car and the consequent throwing of Mrs. Fisher upon the railing of the car, it was important to the defendant that the evidence offered and rejected should have been admitted, as it tended to show that she could not have been hurt in the manner claimed for the complainant. The testimony was therefore relevant. The chancellor seems to have excluded it on the ground that the experiments would probably confuse the jury, rather than enlighten them. We cannot see how such a result would follow. The experiments gave a concrete example of the effect of the motion of the car. The chancellor said that it was a law of motion that a body would fall in the direction of the swerve, and that counsel could argue this without experiment. This is not an answer to the right of the defendant to show by a vivid example how the law of motion would really operate under exactly similar conditions. Such an experiment would have enabled the jury to grasp and understand this law of physics more firmly. It is insisted in behalf of the complainant that the conditions were not similar. But the witnesses show that they were—the same car, the same track, unchanged, and running at various speeds from two miles an hour

to ten miles an hour. It is said that the persons who made the experiments were men, and the one who was injured was a woman, a small one at that. This would not alter the result. A large body would fall more heavily, but not more surely than a small one.

As to the competency of experiments, this has been settled in Tennessee by numerous cases. *Byers* v. *Railroad*, 94 Tenn., 345, 29 N. W., 128, and cases cited therein; *Boyd* v. *State*, 14 Lea, 161; *Lipes* v. *State*, 15 Lea, 125, 54 Am. Rep., 402; *Mississippi & Tennessee R. R. Co.* v. *Ayers*, 16 Lea, 725.

In *Byers* v. *Railroad*, supra, it was assigned as error that the court excluded the testimony of one Henry Mangrum, who, at the request of the company, made an actual test to see whether the train that caused the death could have been stopped after the engineer saw, or could have seen, the man on the bridge. This witness proposed to prove that he ran the same train on a different day after the accident over the same place and bridge; that he had the same number of coaches; that in making the test, as soon as he could, being on the lookout, see an object standing on the center of the bridge, he applied every means known to him or other skillful engineers, and used every endeavor to stop his train; and that it was impossible to stop such a train before passing over the bridge, and that his entire train passed over the bridge before he was able to stop it. He further would have testified, if allowed, that he applied his air brakes, reversed his engine, and used every means known

Fisher v. Insurance Co.

to engineers to effect the stop, but was unable to do so. The test was made by Mangrum for the purpose of making him a witness, and proving the result of the test. On objection, this evidence was not allowed to be given. The judgment of the trial court was reversed for this error. The court said: "We are of opinion that the trial judge was in error in not allowing evidence of this test to be introduced under instructions to the jury as to its weight. We cannot speculate on what might have been the verdict of the jury if this evidence had been allowed to be introduced. It was upon a vital point in the controversy."

So, in the present case, the evidence was on a vital point in the controversy, because, unless Mrs. Fisher received the injury upon some railway car propelled by steam, compressed air, or electricity, there could be, under the terms of the beneficiary supplement of the policy sued on, no recovery.

In *Byers* v. *Railroad*, the case of *Chicago, St. L. & P. R. R. Co.* v. *Champion* (Ind.), 32 N. E., 874, 23 L. R. A., 861, was referred to with approval. In that case it appeared that the plaintiff brought an action for injury due to the negligence of a fellow servant, one Theodore Leonard, a yard brakeman, who it is alleged was inexperienced, incompenent, unskillful, and negligent, and that appellant, at the time of his employment, and during the time he was in the service of appellant, had knowledge of such incompetence; that, while appellee was performing his work in appellant's yard, appellee undertook to

couple a car, which Leonard was riding down upon a siding, to a car which was standing upon the siding; and that when he was in the act of making the coupling, and when the moving car was within from six to eight inches from the other car, Leonard negligently loosened the brake on the moving car, which caused it to spring or jump forward, and catch and mash the plaintiff's hand between the draw bars. To prove that under such circumstances a car would not spring forward when the brakes were loosened the appellant produced evidence of experiment made with a similar car which the same brakeman in similar weather operated on the same track in the same manner. The exclusion of this evidence was held error, on the ground that the conditions under which the experiment was made were subtially the same as those under which the accident occurred. The court said:

"In the offer to prove in this case, many circumstances were included that were wholly unimportant, such as the fact that the same brakeman was on the car and handled the brakes in both instances. The important fact sought to be established by the experiment was whether or not a car moving at a slow rate of speed, down a slight incline, with the brakes set, would, when the brakes were suddenly loosened, jump or spring forward. If it would do so in one instance, it would, under ordinary conditions, repeat it every time the experiment was tried; for it would be the result of the operation of the laws of motion. The rate at which the car was mov-

ing, the suddenness with which the brakes were loosened, the degree of the inclination of the track, might affect the celerity of the movement, but would not affect the nature of the movement. If the question for investigation was the distance which it would jump, or the celerity of the movement, all these things might be important; but in determining whether it would or would not jump, they are comparatively unimportant. In our opinion, the circumstances under which the experiment was made were sufficiently similar to the facts surrounding the happening of the accident to make it admissible in evidence, for what it was worth, and for this error the judgment must be reversed."

See, also, the following text-book: 2 Elliott on Evidence, sections 1249 to 1252, inclusive.

We are of opinion that the chancellor committed error in excluding the evidence referred to, and the first assignment must be sustained.

The second assignment is based on that portion of the judge's charge to the jury which is as follows:

"The plaintiff in this suit has been present in court during the trial and heard the testimony of witnesses relating to his conduct about the time his wife is alleged to have received the injury. There have also been admissions made by him, under oath, at a former trial in this court, reflecting upon his character and otherwise bearing directly upon the issues in this suit. The proof also shows that the plaintiff was with his wife most, if not all, of the time after it is claimed she was injured until

her death, which occurred some twenty-seven hours af-
terwards, and that during the greater part of this period
he was the only person with her.   Under the issue, in
this case, the symptoms, conditions, appearance, and
medical treatment after the injuries are facts relevant
and proper for consideration in determining the issue in
this case, as to whether the injury alleged to have been
sustained by her in fact caused her death, independenty
of all other causes, or whether the morphine, or other
drugs, given her, or some other causes apart from the in-
juries, caused or contributed to her death.

"The failure to call an available witness possessing
peculiar knowledge concerning facts essential to the
party's cause, direct or rebutting, or to examine such
witness as to the facts covered by his special knowledge,
especially if the witness be naturally favorable to the
party's contention, relying instead upon the evidence of
witnesses less familiar with the matter, gives rise to an
inference, sometimes denominated a 'strong presump-
tion of law,' that the testimony of such uninterrogated
witness would not sustain the contentions of such party
to the suit.   This rule applies with peculiar force to a
party to a suit who refuses to testify, and it is applicable
to Dr. Fisher in this case.

*"If, however, you believe that the testimony of Dr.
Fisher, taken on the trial of a former case and intro-
duced by the defendant on this trial, contained all the
evidence within the knowledge of Dr. Fisher which is
favorable to the defendant, you should take this into con-*

*sideration, in this connection. In other words, it is not right that the defendant should introduce all the testimnoy of Dr. Fisher against his interest and in favor of defendant, and then, in addition, have the full benefit of the presumption against him arising from his not testifying in the case."*

The last paragraph is the one to which objection is made. We write this in italics for convenience of reference.

In order to a proper understanding of this portion of the charge, it should be stated that the complainant had been a witness in the suit which he had brought to recover on a policy which he had in the Pacific Mutual Life Insurance Company; that his testimony was taken down in that case by a stenographer. He was cross-examined there at great length. In the present case the transcript which the stenographer had made from his notes was used by counsel for the defendant. He placed the stenographer on the witness stand, and read to him from different parts of the cross-examination in the case referred to, and proved by him that the complainant made the statements which were selected for evidence by the said counsel for defendant. The stenographer also testified that he thought counsel for defendant made a full examination of the complainant in that case, who is also complainant in this case.

The admissions of the complainant which were thus placed in evidence were to the effect that a short time before he married his wife, who was then a widow hav-

ing some estate, he borrowed $700 from her on pretense of being in trouble about shooting a man in Arkansas, for which there was no foundation in fact; that, instead of marrying in Memphis, where they both lived, he took her over into Arkansas and married her there; that his pretense for taking her there was that he had a negro patient that he wished to visit, whose name he did not remember, and whom he had never seen before; that immediately upon the marriage ceremony being performed he left his newly made wife, and went up into Obion county, this State, and thence into Lake county, and was gone sometime; that she tried to find him; that she did subsequently find him, and that they took a wedding trip together, his wife paying all the expenses; that before he married and after his marriage he was criminally intimate with a Mrs. James and with several other women; that one of these women lived immediately across the street from his own home, or his mother's home, to which he had taken his wife.

It was further proven from the cross-examination referred to that he always treated his wife "nicely," yet she was very jealous; that she was jealous of his little niece, three years old, and also his mother; that she could not bear for him to show attention to any one; again, that he knew that his wife was not happy, because she was always jealous of some one. It was also proven that his wife's little daughter, who lived with them, was charged by him for medical attention, and also for board; that his wife paid everything; that during this

time he was allowing the Mrs. James referred to, and several other women of loose character, to buy goods on his credit at the stores of Memphis; that he did not believe that his wife was jealous about Mrs. James, because he did not think she had knowledge of her, or of his relations with her; that he would not deny that he was out buggy riding with Mrs. James very shortly after his wife's death; that he was with her shortly afterwards at all events; that he induced this woman to leave for Chicago to keep her from being a witness.

With reference to the condition of his wife during her illness, it was proven from the cross-examination referred to that her pulse was somewhere from a 100 to 110; that it got slower "as the disease, the injury, advanced." Being asked why he wanted to have Dr. Haynes, the physician for the street railway company, at his house to see his wife just after she died, it is proven that he said, "I don't know any reason why;" that he had reached a conclusion before Dr. Haynes got there; that during her illness he did not put any bandages at her side for the broken ribs; that he had a hotwater bag at her side; that he examined her skin during her illness, and it seemed normal.

The foregoing was all in the record that the trial judge could refer to when he told the jury that if they believed that the testimony of Dr. Fisher, taken on the trial of the former case, "contained all of the evidence within the knowledge of Dr. Fisher which was favorable to the defendant," they should take this into considera-

tion in applying the presumption, and in saying to them that it was not right that the "defendant should introduce all of the evidence of Dr. Fisher against his interest and in favor of defendant, and then, in addition, have the full benefit of the presumption against him, arising from his not testifying in the case."

There were other facts proven in the record upon which the complainant might have thrown light, which were not touched upon in the cross-examination just referred to so far as the present record shows. There were circumstances proven by Mrs. Noel as to his cruel treatment of his wife in her home; also his cruel treatment of her while at Clarksdale; accusations made against him by his wife relating to the death of her child; strong circumstances referred to in the letters of his wife to Mrs. Noel, bitterly accusing her husband; grave circumstances proven by Dr. Haynes on the night of the death of the wife; circumstances relating to the alleged forgery of the will, and forgery of one of the beneficiary supplements; his securing a signature thereto of the former agent of defendant after his wife's death; circumstances testified to by Mr. Brewer as to the compromise of a suit in Mississippi about some land of his wife, in which he was openly and directly charged with being responsible for the death of his wife. These were facts and circumstances proven by independent testimony, and not by the admissions of the complainant.

The letters of the wife referred to are as follows: "I am real sorry that I could not come down to see you, but

Fisher v. Insurance Co.

don't look like I will ever get to go anywhere else. When you have a devilish, contrary man, to ask all the time, like I do, you have to stay at home to keep peace. I cried all day yesterday and last night, and my eyes are swollen so bad this morning I can hardly see. I don't see what a man wants to be so mean for; but when one sees that he can make a woman do, he certainly will. I just give up to Dr. Fisher to keep from having a fuss. Say, Ida, don't wait on me. Do come up some day and spend the day with me, as I am so lonely. I want to see you so badly. Now, for God's sake, don't go back on me, as I feel like you are the only friend I have. Oh, what a miserable life I do have to live. Ida, you know I have had lots of trouble in my life, and have shed lots of tears; but I have just shed about as many in the last ten months as I have in all my life put together, and this is saying a whole lot. I just can't see anything bright in the future for me. What a fool I was for marrying again. Hope your life will be different from mine. How can any one be so deceived? Ida, don't let any one see this, as I have got the blues so bad, I don't know hardly what I did write. Now, be sure and come up Sunday and spend the day with the old deserted woman. Will close, hoping this letter will find you well. Please write me a long letter. Ida, how is George? Tell him howdy for me, and ask him to write me a few lines of cheer. Give my best regards to Mr. Noel and baby, and write soon." This letter was written on July 30, 1907.

The other letter was written August 28, 1907, and was

as follows: "I got home all O. K., but was so sick and nervous, was almost crazy. Was in bed all day, and not a soul to hand me a drink of water. I have not been to the table since I came back. All I have to say is I am a big fool. Yes, he was here, and had the devil in him so big he was about to pop, and has been ever since I got back. But just let him keep it up if he wants to. I asked him why he didn't write as he promised, and he said he had started to and thought to himself, 'I will be damned if I write her a word.' I asked him last night not to be mad at me any more; 'let's make up,' and he said, 'No, not me; you can just sweat it out.' Oh, God knows my heart is so full I hardly know what I am writing. I can't eat, sleep, or do anything else but cry. I feel so bad I have not got good sense, and if things don't change in the next few days you need not be surprised to see me at any time. As I told you at the depot, I just wouldn't live the next six months as I have the last six. He is the biggest fool I ever saw, and that old mammy of his makes him worse than he really would be. Oh, I pray to God to die and get out of this miserable old world; but I don't want to take my life, as it is a sin, and I do want to go to rest when I die. Well, as I feel so bad, will close. Now, Ida, answer this. Give my best to Mr. Noel and baby, and the rest yourself."

It was also proven, at the time of her marriage to complainant, August 28, 1905, the intended wife had a $2,000 policy on her life in the New York Life Insurance Company. On the 4th of June, 1906, the beneficiary clause

was changed from executors, administrators, and assigns, as named in the policy, to J. Baxter Fisher, husband; that on November 5, 1906, he took out a beneficiary supplement on his wife's life in his favor for $10,000, accident policy; that on the 13th of July, 1907, he took out, or attempted to take out, another beneficiary supplement on his wife's life in his favor for $5,000; that within two months after his marriage he took out an accident insurance policy in the Pacific Mutual Life Insurance Company of California for $10,000 on his wife's life, for his benefit.

Since the case must be reversed, we shall not discuss these facts, nor state their tendency toward any particular conclusion. It is certain, however, that, all of them being matters within the knowledge of complainant, it was incumbent upon him to speak in reference to them. The chancellor had no right to assume, and so direct the jury, nor did the jury have a right to assume, that all of these facts had been proven in the case of the Pacific Mutual Life Insurance Company, and that they were embraced in the transcript of the evidence of complainant in that case which the counsel for defendant held in his hand when he examined the statement; or, even if it were proper to entertain such an inference, still there may have been something which was omitted by counsel in the former examination, or a reference to some other topics. In addition to this, the fact that there had been proven against him the admissions above referred to, taken from his cross-examination in the case of Pacific

Mutual Life Insurance Company, so far from exonerating him from the duty of going upon the witness stand, only gave added reasons therefor, in order that, if in possession of other facts which might qualify the admissions made, he might add them. It would be just as reasonable to say that, if a witness should prove in the presence of one of the parties that the latter had made a certain admission, this would prevent the party so relying upon the admission from having the benefit of the presumption of silence against the party so charged with the admission. This would practically abrogate the rule. The reason given by the chancellor in the excerpt italicized is, as we think, altogether untenable. The basis for that reason is that, inasmuch as certain admissions had been proven against a party in his hearing, he need not go on the stand to deny or explain them, and that his silence must be treated as nothing against him. The italicized language, in fact, completely destroyed the effect of the presumption, and we think constituted clear and reversible error. The authorities in this State are directly and forcibly in favor of that portion of the judge's charge preceding the language italicized. See *Dunlap* v. *Haynes,* 4 Heisk., 476, 480; *Jackson* v. *Blanton,* 2 Baxt., 63, 66, 67; *Bennett* v. *Massachusetts Life Insurance Co.,* 107 Tenn., 371, 64 S. W., 758; *Standard Oil Co.* v. *State,* 117 Tenn., 676, 100 S. W., 705, 10 L. R. A. (N. S.), 1015. Even a stronger statement would be justified by the cases of *Dunlap* v. *Haynes and Bennett* v. *Mass. Ins. Co.* To same effect, *Pacific Coast S. S. Co.*

v. *Bancroft-Whitney Co.,* 94 Fed., 180, 36 C. C. A., 135; *Railway Co.* v. *Ellis,* 54 Fed., 481, 483, 4 C. C. A., 454, 456. In the case last cited it is said:

"It is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion. 'It is certainly a maxim,' said Lord Mansfield, 'that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted.' *Blatch* v. *Archer,* Cowp., 63, 65. It is said by Mr. Starkie in his work on Evidence (volume 1, p. 54): 'The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is in his power and which rests peculiarly within his own knowledge frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.' "

The assignment of error is well taken, and must be sustained.

The third assignment is on the same general subject. It is based upon the refusal of the trial judge to give the jury in charge special request No. 26 offered by counsel

for defendant. This special request, after repeating all of the judge's charge as set forth under the preceding assignment except the paragraph in italics, continues as follows:

"It is the duty of a party to a suit in a court of equity to make disclosure of all of the material and relevant facts in his possession bearing upon the issues in the suit, and to withhold none, so that the merits of the controversy may be fairly and properly determined. The plaintiff, J. B. Fisher, is a competent witness under the laws of this State, but has not testified as a witness in this suit. His failure to testify is unaccountable upon any other reasonable hypothesis than that he could not deny the truthfulness of the testimony given against him as to his conduct about the time of his wife's injury, and as to the admissions made by him at the former trial; nor can his failure to take the stand and testify concerning the symptoms and conditions and appearance of his wife after the injury be accounted for upon any reasonable ground, except that, if he testified, his testimony would have tended to disprove that her death resulted from accidental means."

This was in effect what the trial judge said, aside from the matter which we have reproduced in italics under a former assignment in the paragraph just quoted.

As we have stated in disposing of the former assignment, the trial judge might have gone much further than he did, and yet been within our authorities. In *Dunlap* v. *Haynes,* supra, the question was whether a

certain conveyance was fraudulent.  The fraud had been charged in the bill and denied in the answer, and evidence had been given tending to show the fraud.  John Haynes was the conveyor, and W. D. Haynes was the conveyee, in the alleged fraudulent conveyance.  They did not go upon the witness stand.  The court said:

"John Haynes and W. D. Haynes were both competent witnesses, and could have made the proof in support of their answer.  Their failure to do so was unaccountable upon any other reasonable hypothesis than that the payment had not been made."

In *Bennett* v. *Massachusetts Mutual Life Insurance Co.,* it is said:

"It appears that there is no testimony whatever to contradict that of complainants.  The soliciting agent of the company, as well as the medical examiner, were present when the answers were given, and neither one was examined, and this raises a presumption that they would not have contradicted the statement of the complainant.  The case is, in effect, a charge of fraud as against them, and this amounted to a challenge to them to testify.  *Jackson* v. *Blanton,* 2 Baxt., 63; *Dunlap* v. *Haynes,* 4 Heisk., 476.  In the absence of any testimony from them contradicting the statement of the assured, we think the chancellor was warranted in finding the facts as stated by the complainants."

In 1 Moore on Facts, section 571, it is said:

"Where facts are in evidence affording legitimate inferences going to establish the ultimate facts that the

evidence is designed to prove, and the party to be affected by the proof, with an opportunity to do so, fails to deny or explain them, they may well be taken as admitted, with all the effect of the inferences afforded. In denying a defendant's motion for a new trial, Mr. Justice Story spoke of the 'most reprehensible and studied refusal of the defendant' to testify at the trial. 'He contented himself with a profound silence as to evidence of his own conduct, leaving the plaintiffs to grope their way through the cause, by doubtful and glimmering lights, gathered from his own imperfect confessions. If he has suffered by the verdict, it has been his own folly and gross negligence.' The inference justly to be drawn against a party thus neglecting to testify is habitually stated by the courts in strong terms. 'Judicial tribunals are established to administer justice between litigants, and the first and most important step to that end is the ascertainment of the truth of the controversies which come before them. It is only when the truth is ascertained that the law can be properly applied in the just settlement of disputes. Litigants owe the duty of assisting in every legitimate way in the elucidation of the truth. When a defendant can, by his own testimony, throw light upon matters at issue, necessary to his defense and peculiarly within his own knowledge, if the facts exist, and fails to go upon the witness stand, the presumption is raised, and will be given effect to, that the facts do not exist.' In a patent infringement suit, Judge Coxe said the evidence of prior invention, as a

defense, was so full and circumstantial that he would have accepted it as conclusive, were it not for the fact that the alleged prior inventor failed to appear as a witness, and no sufficient reason was given for his nonappearance. 'No matter from what point of view the question was approached,' said the judge, 'there was always the suspicion that if he could have corroborated the other witnesses he would have done so,' and the defense was held not to have been proved."

We make the following excerpts from the notes to the above section:

"The defendant does not offer his own testimony. He prefers the adverse inferences, which he cannot but perceive may be drawn therefrom, to any statements he could truly give, or to any explanations he might make. He prefers any inferences to giving his testimony. Why? Because no inferences can be more adverse than would be the testimony he would be obliged, by the truth, to give." *Union Bank* v. *Stone,* 50 Me., 595, 599, 79 Am. Dec., 631, per Appleton, J.

"In a suit for infringement of a patented ink, the plaintiff's expert testified that an analysis showed the presence in the defendant's ink of constituents in the plaintiff's combination; and the defendant's neglect to deny their use left 'no doubt' that the analysis was substantially correct." *A. B. Dick Co.* v. *Belke & Co.* (C. C.), 86 Fed., 149.

"The ordinary rule is that one who has knowledge peculiarly within his own control, and refuses to divulge

it, cannot complain if the court puts the most unfavorable construction upon his silence, and infers that a disclosure would have shown the fact to be as claimed by the opposing party." *Societe, etc., v. Allen,* 90 Fed., 815, 817, 33 C. C. A., 282, 284, per Taft, C. J.

"In a civil action to abate a liquor nuisance, the defendant did not contradict direct testimony to his unlawful sale of liquor. 'With his property thus in peril, and his building likely to be closed under the proceedings, we must believe he would have spoken the truth, if it would have been in the interest of his protection,' said the court. 'We regard the case, upon the whole, as a practical confession of the defendant's guilt.'" *Dickinson* v. *Bentley,* 80 Iowa, 482, 45 N. W., 903, per Granger, J.

In the present case there were certain facts within the complainant's knowledge to which no one could have testified but himself. He alone was with his wife at the time of the alleged accident, and knew what her physical condition was. He alone knew what could have caused her to fall or sink down in the car when there was not the slightest evidence of a jar or a jolt, and when the swerve of the car which it is claimed produced the fall would under the operation of natural physical laws have thrown her in the opposite direction. He alone could explain *all* the circumstances surrounding the alleged accident, for he was in touching distance of his wife, and between her and Dr. Leibkeman. He alone could explain why she did not endeavor to support herself or

catch hold of the seat on either side to prevent her sink-ing to the floor. He alone could explain why there was not the slightest exclamation or moan when she thus sank down. He only could tell exactly what she received in the way of drugs during all the time that he was alone with her, and when Dr. Farris, the only other attending physician, who saw her only once every four hours, was absent. Only he could explain how it was that, when Dr. Farris retired at 10 o'clock, leaving the patient in as good condition as she had been since the alleged in-jury, she should have taken a turn for the worse, and that, notwithstanding this, while he alone was with her, he should have claimed to have fallen asleep, and did not awaken for thirty or forty minutes, until she was in the agonies of death.

We think these facts, and other facts referred to un-der the preceding assignment, made it extremely import-ant that the complainant should have gone before the jury. It is not a sufficient explanation of his failure to do so that he shrank from the humiliation of having to re-peat again his infidelities to his wife, and his having borrowed money from her to get married on, and to take his bridal trip on. These were important matters, but not to be compared with the dark inferences which de-fendants sought to draw from his silence.

However, the request under consideration was stated in language too strong, and direct, and would have re-sulted in invading the province of the jury if it had been given. The assignment must therefore be overruled.

The jury might properly have been instructed that they would be justified in presuming against complainant, and assuming as true the facts which he might have disproven by his own testimony if untrue, if they should see proper so to do.

The fourth assignment of error is based upon the following excerpt from the charge:

"If you find that there is evidence in the case tending to show discord between Dr. and Mrs. Fisher, or bad treatment of Mrs. Fisher by Dr. Fisher, or immoral conduct of Dr. Fisher, or that he forged the will purporting to be the will of Lula A. Fisher, or was guilty of other wrong conduct, you can consider said evidence as a part of the circumstances surrounding and preceding the death of Mrs. Fisher, in determining the cause of her death; but if you conclude, from the preponderance of the evidence, that the injury received on the street car, directly and independently of all other causes, through external, violent, and accidental means, resulted in and caused her death, then you should not allow any prejudice against the complainant, Fisher, by reason of evidence reflecting on his character, to affect your verdict. If you believe from the proof that his character is bad, you may consider this as bearing on the probability or improbability of bad conduct on his part, as bearing on the question whether he was impelled by good or bad motives; but, if he has made out his case by a preponderance of the proof, he is entitled to recover, no matter how bad you may believe his character to be."

The criticism upon this part of the charge is that it segregates the testimony introduced by the defendant as to the probable cause of the death of Mrs. Fisher from that part of the testimony which immediately concerned the alleged accident in the car, and told the jury, in effect, that they might consider the latter evidence apart from the former in reaching their conclusion as to the cause of the death. We do not think this is a proper criticism. The portion of the charge quoted, when fairly construed, means that the jury are to take into consideration all of the facts proven in determining where the preponderance of the evidence lies as to the cause of the death.

This assignment is therefore overruled.

The fifth assignment is based on the following excerpt from the charge:

"Evidence is introduced in regard to the execution of a will by Mrs. Lula A. Fisher. This testimony is material only as a part of the circumstances surrounding and antedating her death, and as bearing upon the question of what, if any, motive Dr. Fisher had to cause his wife's death, and you can consider this testimony only in this connection.

"The court charges you that the Code of Tennessee provides that a will shall be proved and recorded, and letters testamentary granted, in a court of the county where the testatrix had her residence at the time of her death, and that if you find that Mrs. Lula A. Fisher's will was proved and recorded in Shelby county, then this

would be the legal way of proving said will, and no inference derogatory to complainant can be drawn from his proving it here, though the testatrix may have had land in Mississippi.

"The court charges you that, under the laws of Mississippi, where a wife dies leaving no children, the husband, by virtue of the marital rights, and independent of any will, inherits the real estate of his deceased wife, and, therefore, that it is immaterial whether said will is proven in Mississippi, or not, in so far as his inheritance of such real estate is concerned."

We are of opinion that the first paragraph was correct.

The second paragraph was immaterial, and should not have been interposed, because it was of a nature likely to mislead the jury.

The third paragraph was also improperly given to the jury, since it does not appear in the evidence that the complainant knew what the law of Mississippi was at the time the will is said to have been forged by him, nor would there be any presumption that he was informed of the law of the foreign State. If he had known such foreign law, it would probably have been an argument against his forging the will, but not otherwise.

The assignment is sustained as to the second and third paragraphs.

The sixth assignment is based on the exclusion by the court of Exhibit No. 1 to the testimony of David N. Carvalho, which was a copy of the alleged signature of

Mrs. Lula A. Fisher to the will in question, made by the witness while on the stand, and offered in evidence by the defendant as an illustration of the ease with which the name could be forged, as well as of the expertness of the witness, and in support of his theory as to how the signature was forged with an indelible pencil, which he used in making the illustration.

We think there was no error in this action of the court. The argument in support of the assignment is that there was a controversy between counsel as to whether a forged signature should resemble the original in order to be a deceptive forgery. That fact goes without saying. No useful purpose could have been served by permitting the witness to imitate the signature of Mrs. Fisher. The witness Carvalho testified that he was a very expert man, and had testified in trials more than 1,300 times. If it had been conceded that he could imitate the signature with great ease, owing to his skill, that would not be a reason for believing that any other less skilled person could make a similar imitation with equal ease. The evidence was wholly immaterial and irrelevant.

We shall consider together the seventh and eighth assignments. These two assignments are based upon certain excerpts from the charge of the court. In order that we may properly understand the bearing of these two portions of the charge, it is necessary that we should read in connection therewith other parts of the charge. The eighth assignment is based on that part of the charge which is first reproduced in italics in the excerpt

below. The seventh assignment is based on the second portion in italics, which second portion relates to the autopsy. The portions of the charge which we desire to read in connection with the two excerpts complained of are as follows:

"The fourth issue is: 'Did the said Mrs. Lula A. Fisher, on or about the 6th day of October, 1907, during the period covered by said policy, receive a bodily injury, while riding as a passenger, in a railway passenger car of the Memphis Street Railway, propelled by electricity, which injury, directly and independently of all other causes, and through external, violent, and accidental means, resulted in the death of the said Mrs. Lula A. Fisher, on or about October 8, 1907?'

"In determining this issue, you will consider, first, whether or not Mrs. Lula A. Fisher received a bodily injury while riding as a passenger in a car of the Memphis Street Railway; second, if she did receive a bodily injury in this way, did said injury result in her death, directly and independently of all other causes, and through external, violent, and accidental means?

"There is no controversy as to the fact of the death of Mrs. Fisher, or the time of it. There is no conflict as to the time and place of the alleged accident on the street car.

"The defendant insists that Mrs. Fisher received no injury capable of producing death, and, therefore, her death resulted from other causes. The defendant also contends that, even if the injury was capable of causing

death, the death did not result from said injury, directly and independently of all other causes.

"If you find that she was not injured in the manner claimed, or that the injury so received did not cause her death, you should answer this fourth issue, 'No.'

"If, however, you find that she was so injured, and that the injury caused her death through external, violent, and accidental means, then it will be necessary for you to consider whether said injury caused said death directly and independently of all other causes. If you find this to be so, you should answer this issue, 'Yes.' Otherwise, you should answer, 'No.'

"If the injury was caused by an unintentional fall against a seat on a street car, it would be through external, violent, and accidental means, within the meaning of the policy, but you would still have to determine the other questions indicated.

"The plaintiff, J. B. Fisher, cannot recover upon either policy of insurance sued upon in this suit unless it appears from a preponderance of the evidence that the death of Lula A. Fisher was the direct result of injuries caused by accidental means, and independently of all other causes. The expression, 'independently of all other causes,' as used in each of these policies, has a definite meaning, and requires the plaintiff to prove, by a preponderance of the evidence, that the injuries claimed to have been sustained by Lula A. Fisher were proximately the sole cause of her death, or, in other words, that the injuries were alone responsible for her

death. So, if you believe from the evidence that morphine, or any other drug given to her in the course of medical treatment, caused or directly contributed to her death, the company would not be liable; or, if you believe that the injuries and the drugs given Lula A. Fisher, acting together, caused her death, the company would not be liable; and, in either event, you should answer issue No. 4 in the negative.

"The evidence introduced in this suit shows that Lula A. Fisher, after she had claimed—after it had been claimed—that she was injured, had morphine and other poisonous drugs given her in the course of medical treatment. The company in this case show that Lula A. Fisher, after it had been claimed that she was injured, had morphine and other poisonous drugs given to her in the course of medical treatment. It is immaterial whether such treatment was proper, or improper, or whether it was the intention and purpose of saving or prolonging her life. If you find from the evidence that the medical treatment caused, or in any wise contributed to, or acted, in conjunction with the injuries, to bring about her death, or hastened her death, there can be no recovery, and you should answer issue No. 4 in the negative. *You may, however, consider whether or not the said medical treatment was in accord with the practice of reputable physicians, and if you find it was you may look to this in determining whether or not said medical treatment contributed to, or hastened her death.*

"In determining this fourth issue, you may look to all

the circumstances antedating and surrounding the death of Mrs. Fisher, as bearing upon the question of the cause of her death."

Then follow some instructions upon the subject of the will alleged to have been forged, the probate thereof in Tennessee, the presumption against suicide, and then the charge upon the autopsy, which was as follows:

*"The court further charges you that the purpose of an autopsy is to ascertain the exact cause of death, and that a chemical analysis is for the purpose of ascertaining whether or not there was any poisonous substance in the stomach of the said Lula A. Fisher; so that, if you find that the body of Lula A. Fisher was exhumed in five or six days after its burial, and an autopsy thereon made by competent physicians and that a chemical analysis was afterwards made of the contents of the stomach by competent physicians and chemists, and no morphine was found in the contents of said stomach, then the court charges you that you may consider these facts in determining whether or not Lula A. Fisher came to her death by morphine poisoning, accidental or otherwise, or came to her death as the result solely of the accident."*

The objection made in the seventh assignment to the charge upon the subject of the autopsy is that it unduly emphasized this particular feature of the testimony, and tended to mislead the minds of the jury with respect to a leading theory relied upon by the defendant, based upon the testimony of physicians, which was as follows: There was evidence showing that certain articles of un-

124 Tenn.—32

digested food were, by the autopsy, found in the stomach of Mrs. Fisher—some pieces of apple skin, some starchy food, and some meat. There was evidence tending to show that she was not in a condition to eat any of these things after she received her injury, and that they had therefore lain in her stomach undigested for twenty-seven hours; that is, from the time of her alleged injury up to the moment of her death. Based on this fact, the medical men testified that the stomach was torpid and unresponsive—in fact, was not discharging its functions at all; that under such circumstances the giving of morphine, even in doses of one-eighth of a grain only every four hours from the time of the injury, although by hypodermic injections into the circulation, would very probably produce a fatal result, because it would accumulate in the system, the circulation being bad, and it not being transferred to the stomach and there eliminated. In support of this theory other evidence was introduced to the effect that shortly before her death her breathing was of a character called "stertorous" and the evidence is that this was indicative of morphine poisoning, and does not occur where the death is from shock. Now, it is insisted that the charge upon the subject of the autopsy tended to obscure this portion of the defendant's evidence, and to lead the jury to believe that if no morphine was found in the stomach there could be no death by morphine poisoning; that is to say, it is insisted that the trial judge unduly emphasized the fact last referred to (that is, that no morphine was found in

the stomach), and did not refer to the other subject. He does make no reference, it is true, to the other subject; but, when this portion of the charge is taken in connection with the other parts which we have copied under this assignment, we cannot say that this was affirmative error. Counsel for the defendant should have prepared their instruction upon the phase of the evidence presenting their theory, in order to prevent any misconception of the charge upon the subject of the autopsy.

We think there was no error in the matter objected to in the eighth assignment, which appears, as we have stated, in that portion of the above excerpt which we have first italicized.

The ninth assignment is based upon the charge which the trial judge gave upon the subject of expert evidence. His instruction upon this subject was as follows:

"A number of expert witnesses have been introduced in this case, and the court charges you that you must receive and consider this class of testimony with great caution, and you must make a careful and painstaking investigation of all the facts, with the view of getting at the truth, and must not be misled or confused by expert testimony, because, while expert testimony is sometimes the only means of, or the best way to, reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth; and I charge you further that, in weighing expert testimony, you must look into all the evidence, and determine whether the facts which

are supposed to exist in the hypothetical questions that are asked of the expert witnesses do actually exist, and whether the facts supposed to exist be true, or not, because, if one fact supposed to be true, included in the hypothetical question, is untrue—that is, not supported by the evidence—then the opinion of the expert would be valueless. He gives his opinion upon a certain state of facts supposed to be true, and we do not know what his opinion would be if one of those facts was withdrawn. And I charge you further that, in weighing such testimony, you may consider the capability of the witness, the fact whether or not he has been employed by one side or the other, his interest or lack of interest in the result of this suit, and you may consider whether the testimony of the experts concur or disagree."

In order to consider the objections raised to this instruction, it should be divided into two parts: First, that portion which refers to expert evidence in general; and, secondly, that portion which refers to that part introduced by the method of stating hypothetical questions.

As applied to the general subject of expert evidence, the court said:

"You must receive and consider this class of testimony with great caution, and you must make a careful and painstaking investigation of all the facts, with the view of getting at the truth, and must not be misled or confused by expert testimony, because, while expert testimony is sometimes the only means of, or the best way to,

reach the truth, yet it is largely a filed of speculàtion, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth."

It is insisted that his honor, in this part of the instruction, discriminated too strongly against this class of evidence, especially in warning the jury that they must not be "misled or confused by expert testimony."

This language we suppose was drawn by his honor from an expression used in the opinion of this court in the case of *Wilcox* v. *State,* 94 Tenn., 106, 112, 28 S. W., 312. The language referred to was not quoted by the judge who delivered the opinion in that case from the charge under examination, but used merely in stating the reason why the trial judge gave the charge that he did. What was quoted from the charge, and approved, was this: "While expert testimony is sometimes the only means of, or the best way to, reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth." The court said: "This is only the closing extract from a long and lucid charge as to the weight to be given to such testimony, both that of nonexpert and that of expert, and the whole is substantially in conformity to the rule laid down that expert testimony is to be received with caution"—referring to *Persons* v. *State.,* 90 Tenn., 291, 16 S. W., 726.

In that case the trial judge said, in his charge: "The retaining of experts by a fee proportioned to the importance of their testimony is now, in cases in which they are

required, as customary as is retaining lawyers. No court would take as authority the sworn statement of the law given by counsel retained on a particular side, for the reason that the most high-minded men are so swayed by an employment of this kind as to lose the power of impartial judgment; and so intense is this conviction that there is no civilized community in which a judge who receives a present from a suitor is not buried in disgrace. Hence it is that, apart from the partisan temper more or less common to experts, their utterances, now that they as a class have become retained agents of parties, have lost all judicial authority, and are entitled only to the weight which a sound and courteous criticism would award such utterances. This is true of such expert testimony, not because it is intentionally false, but on account of the tendency of the mind in all manner of criticisms to adopt the view most favorable to a client or friend. But, as a matter of law, such employment and remuneration do not render them inadmissible as witnesses."

In considering this charge this court said:

"It was highly proper in the court to instruct the jury to scrutinize the testimony of experts. It was his duty to instruct them to look to their character, manner, and capability, to the circumstances that brought them in as witnesses, to the fact of compensation, and to what extent, if any, under all the circumstances, their credibility might be affected thereby; but it was error to say in almost direct terms that, while the medical experts intro-

duced by defendant were admissible in law as witnesses, they were not entitled to credit."

In the case of *Bateman* v. *Ryder,* 106 Tenn., 712, 715, 64 S. W., 48, 49, 82 Am. St. Rep., 910, the following occurs upon the subject of expert evidence.

"It is said that the trial judge erred in charging the jury that 'the testimony of experts, introduced for the purpose of establishing insanity or mental unsoundness, if paid for, should be received with great caution and carefully weighed by the jury.'

"The court charged further upon this feature of the case that 'it was lawful and proper for an expert physician to charge a reasonable compensation or fee for his professional opinion or services.'

"We think that the rule laid down by the trial judge is in substantial conformity to that announced in *Persons* v. *State,* 90 Tenn., 291 [16 S. W., 726], and *Wilcox* v. *State,* 94 Tenn., 112 [28 S. W., 312.]"

In *Atkins* v. *State,* 119 Tenn., 458, 472, 105 S. W., 353, 356, 13 L. R. A. (N. S.), 1031, the charge under examination was as follows:

"Expert and nonexpert witnesses have been allowed to testify to you as to the truth or falsity of the plea of defendant of unsound mind. In reference to the expert testimony offered you in this case, and which you should weigh and consider along with the other proof in the case, I charge you in regard to it that expert testimony should be received with caution. While expert testimony is sometimes the only means of, or the best way to

reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties, and requires patient and intelligent investigation to reach the truth. You should give just such weight as you do all the other testimony in the case, governed by a rule to arrive at the truth, giving fair and impartial estimation of all the evidence adduced in the case."

Commenting upon this part of the charge, this court said:

"It is said that this portion of the charge singles out expert evidence and discriminates against it, practically telling the jury that it is without value. We do not think this is an accurate criticism. The judge merely cautions the jury against the infirmities attaching to this particular species of evidence, and he adds in the last sentence that the jury must give it such weight as they do all the other testimony, having in view a purpose to arrive at the truth, and being careful, at the same time, to give to this evidence a fair and impartial estimate or value, as they must do to all the evidence adduced."

Now, in the charge commented on in that case, the trial judge first told the jury that expert evidence must be received with caution, and gave as a reason for it that this kind of evidence is "largely a field of speculation, beset with pitfalls and uncertainties." He then told them that they should be careful to give such evidence patient and intelligent investigation to reach the truth. Further, he said to them, in substance, that, having in

view this admonition as to the spirit in which the inquiry should be prosecuted—that is, with caution—and the method by which this caution should be directed, with patient and intelligent investigation to reach the truth, when they should in this manner reach the truth, they should give to that truth, drawn from such evidence, just such weight as they did to all other testimony in the case, giving a fair and impartial estimate to all of the evidence adduced in the case, governed by the purpose to arrive at the truth.

In 2 Elliott on Evidence, section 1047, it is said:

"The better rule, and that which seems to be supported by the weight of authority, is that the opinions of experts are not conclusive, at least where there is other evidence from which a contrary conclusion may be legitimately drawn; nor, on the other hand, are they necessarily entitled to less weight than other evidence, and it is error to instruct the jury that they are entitled to less weight and must be received with caution. They are, in general, to be received and weighed by the jury like other evidence. Some courts, however, have held that it is not error to instruct that they are not entitled to the same weight, or that they should be received with caution."

This court, by the cases already cited, is thoroughly committed to the doctrine that such evidence must be received with caution, and that where it is paid for, it must be received with great caution; but further than this we have not gone. There is evinced in the case of *Atkins* v.

*State,* an inclination to bring our authorities as nearly as possible into line with the current of authority, without, in terms, modifying the prior cases. We do not think that any of these cases would justify the trial judge in warning the jury that they "must not be misled or confused by expert testimony." We think this is discriminating too heavily against that class of evidence, and that the trial judge committed error in this respect. We also think he committed error in charging, in respect of all of the expert testimony in this case, that it must be received with *"great* caution."

The second part of the charge upon this subject has reference to that part of the expert evidence which was based upon responses to hypothetical questions. The objections is that he instructed the jury that in weighing the answers of experts to such questions, they must look into all the evidence and determine whether the facts supposed to exist, in the hypothetical questions asked, did actually exist, "because, if one fact supposed to be true included in the hypothetical question, is untrue, that is, not supported by the evidence, then the opinion of the expert would be valueless. He gives his opinion upon a certain state of facts supposed to be true, and we do not know what his opinion would be if one of those facts was withdrawn." We think this is in substantial accord with the authorities. In the section above referred to of Elliott on Evidence, it is said:

"It has also been held proper, where the opinion of a medical expert is based on a hypothetical question, to instruct the jury that if the assumed facts, or any of

them, are not true, the opinion should be rejected." The author adds: "But it would seem that such instruction would be too broad, at least, in some cases." The instruction is also supported by section 392 of 1 Brickwood's Sackett's Instructions to Juries.

The objection made by counsel for the defendant is that there might be an immaterial variation between the fact assumed in the hypothetical question and the evidence supporting it. Of course, those who prepare hypothetical questions must be careful to embody only material facts. The jury is not supposed to be able to discriminate between the material and immaterial facts in such cases. They act only upon the evidence submitted to them, and upon all of the evidence. The expert is a scientific person, and it cannot be known to the jury what he regards as material or immaterial in making up his answers. By cross-examination the immaterial matters are frequently sifted out, and the net residuum is found on which the real opinion of the expert is based. If this is not done, however, the hypothetical question is put at the peril of the party who propounds it. If he has doubts as to the materiality of certain points in the question, or as to whether certain items of a supposed fact contained therein are sustained by the evidence, he may frame other hypothetical questions, leaving those out. But, whether the questions framed be one or many, he must stand on each separate question as framed. Of course, there may be small, trifling, variations as to dates and names, times and places, etc., which would not affect, in

a given case, the general result of the opinion expressed by the expert. These matters, however, it is impossible to forecast, or to govern by any general rule, and they must be left to the skill of counsel in framing special instructions in particular cases to guard against the general instruction above mentioned, which expresses the rule.

The tenth assignment is based on the following excerpt from the judge's charge:

"The court further charges you that the complainant is entitled to a presumption that his wife did not commit suicide, and that his wife was not murdered by him or any one else. Each of these presumptions may be overcome by facts and circumstances which establish the contrary; but the court instructs you that they stand until they are overcome by the preponderance of the evidence, sufficient for that purpose."

The special objection raised to this portion of the charge is based upon the use of the word "establish," which was defined in *Knights of Pythias* v. *Steel,* 107 Tenn., 1, 7—11, 63 S. W., 1126, 1128, to mean "to settle certainly or fix permanently what was before uncertain, doubtful, or disputed." In that case it was used in connection, however, with the words "to the satisfaction of the jury," and the words "satisfaction" was held to import a degree of evidence amounting to placing a disputed proposition beyond the pale of reasonable doubt. So that the instruction that it was incumbent upon a party "to establish the fact to the satisfaction of the jury" was

Fisher v. Insurance Co.

equivalent to saying to them that he must make it appear beyond a reasonable doubt. In view of the authorities just referred to, the use of the word "establish" by the trial judge was unfortunate; but, when taken in connection with the rest of the paragraph, we do not think it could be held reversible error. In the latter part of the excerpt it is said: "But the court instructs you that they" [these presumptions] "stand until they are overcome by the preponderance of the evidence, sufficient for that purpose"—that is, sufficient to overcome the presumptions. We do not think the jury could have gotten from the whole excerpt the idea that it was intended by the circuit judge to charge that these presumptions must be overcome by evidence showing the fact to be otherwise beyond reasonable doubt. Of course, we take it that in the next trial his honor will omit the use of the word "establish," and use some other word less liable to misconception.

Complainant's counsel say that this portion of the charge was taken from a charge approved in *Insurance Co. v. Bennett,* 90 Tenn., 256, 16 S. W., 723, 25 Am. St. Rep., 685. The word "establish" was used in the charge referred to, but no point was made upon it, and the question was not considered in that case, and that was not the point of inquiry at all. In the later case it was considered, as we have shown.

As to the eleventh assignment, we think the objection made is hypercritical, and this need not be further noticed.

As to the twelfth and thirteenth assignments of error, these refer to a merely formal defect in the evidence as to whether the car on which the alleged accident is said to have occurred was operated by one of the agencies contemplated by the policies of insurance. Such defect can easily be supplied in the next trial, and need not be further referred to.

The fourteenth assignment is based upon the refusal of the circuit judge to give in charge the following special request or instruction offered by the defendant below:

"Both policies of insurance sued upon in this suit required the plaintiff, J. B. Fisher, to furnish the defendant, the Travelers' Insurance Company, at the home office at Hartsford, Conn., affirmative proofs of the death of Lula A. Fisher, after the happening of the injuries. This requirement is a condition precedent to a recovery, and it is incumbent upon the plaintiff to prove upon the trial of this case such proofs of death were furnished as required by the policies. The court charges you that there is no evidence in this case that the proofs were furnished in the manner required by the policies, and you should answer issue No. 5 in the negative."

The complainant endeavored to prove, by Dr. Farris, that the proofs had been sent to the company; but, on cross-examination, this witness testified that he only knew that he had made out the proofs, but he had no knowledge as to whether they had been sent to the company.

Fisher v. Insurance Co.

Mr. Bensdorf, the agent of the company, was introduced, and he denied any knowledge on the subject. His testimony is referred to by the counsel for the complainant, in which he was asked: "Will you say whether or not the complainant handed in proofs of loss to your office under policies Nos. 3918578 and 2086026, beneficiary supplements Nos. 1953 and 82887, about the 26th of November, 1907. A. I could not say whether they were handed into our office, or sent directly to the company, without examining my record."

It is insisted that this was an admission that they were either handed into the office or sent to the company; but in another part of the same deposition he says that he was not in the office at the time the alleged accident occurred, and he did not know whether any notice had been sent there or not. He did not profess to know what was on the records of the company in Hartford. We do not think his evidence can be taken as sustaining in any sense the fact that the proofs were sent either to his office or to the company. Moreover, the policies required that notice should be sent to the home office at Hartford, and this would have to be complied with.

So, if nothing else appeared, except what has just been stated, the instructions should have been given. However, it appears that the company demanded an autopsy; and, of course, this was a waiver of the proofs of loss. It was necessarily implied from this requirement that the company considered itself bound, in case an accident had occurred from which death proximately followed, independent of all other causes.

The request, therefore, was properly refused.

The fifteenth assignment is based upon the refusal of the trial judge to grant a new trial on account of newly discovered evidence, as set forth in the affidavits of M. F. Griffin, Irene Haynes, W. M. Griffin, T. B. Turley and G. T. Fitzhugh, filed as exhibits A, B, C, and D, respectively, to the written motion for new trial.

It is unnecessary to consider this assignment, because, as the case must be reversed on other grounds, the evidence referred to may be introduced at the next trial, if then deemed material.

The sixteenth assignment of error is based upon the action of the trial judge in giving the following instructions to the jury:

"The second and third issues are practically the same in regard to the beneficiary supplements on the other policy. The second and third issues are intended to present the same question as to the other policy, No. E33730. In this instance, however, there are two beneficiary supplements attached to the policy—one, No. B. S. 82887, dated May 20, 1907; the other, No. B. S. 96377, dated July 13, 1907. It is the purpose of those issues to have you say whether or not either of these beneficiary supplements was in force on the 6th, 7th, and 8th days of October, 1907. These supplements contain this language: 'Provided, second, that the beneficiary signs consent below to the insurance herein given and warrants all the following statements to be true.' They also contain at the bottom a blank line, intended evidently for

the signature of the beneficiary under the supplement. The first supplement contains no signature purporting to be that of the beneficiary, Lula A. Fisher. The second supplement does contain such a signature, which the defendant insists was not signed by Lula A. Fisher, nor by any one for her, by her authority, and with her knowledge and consent. It is also insisted that the first supplement was released by J. B. Fisher and his wife. In order that you should answer either of these issues, 'Yes,' you should find either that Lula A. Fisher signed one of them, or that she knew of and consented to the signature of her name by some one else, or that the defendant company waived such signature. If the agent of the company knew that the original supplement, dated May 20, 1907, was not signed, and did not insist on that signature, and did not intend to insist on said signature, and the company collected the premium, then the company could not be heard to say afterwards that the supplement was void. If the purpose of J. B. and Lula A. Fisher, in releasing said first supplement, was merely because it was lost, and in order to substitute another, and you find that the signature to said first supplement was waived, then you may answer either or both of said issues in the affirmative.

"If, however, you find that the purpose of Mrs. Lula A. Fisher in releasing said first supplement was to prevent any such insurance being in force as to her, and that she did not know, or consent to, the second supplement, you should answer these issues, 'No.' "

The seventeenth assignment is based upon the refusal of the trial judge to give in charge request No. 24, as follows:

"The court charges the jury that in the express provisions of the contract known as 'Beneficiary Supplement B. S. 96377, it must be signed by the beneficiary, Lula A. Fisher, before the same is valid and binding on the defendant company.

"The court charges you that the undisputed evidence is that Lula A. Fisher did not sign her name thereto, but that her name was signed thereto by some one else. You should therefore answer issue No. 3 in the negative."

The eighteenth assignment makes the point that there is no material evidence to support the findings of the jury on Nos. 3 and 8, or either of them, as to beneficiary supplement No. 96337, for $5,000, and asserts that the undisputed evidence is that the signature thereto was forged by complainant, and that, as matter of law, this signature was essential to the validity of the supplement.

These three assignments must be overruled. Aside from the question whether beneficiary supplements Nos. 82887 and 96337 should have been signed by the wife in the ordinary course of dealing, we think the defendant is 'estopped in the present case from making the point. We base this conclusion upon the fact that No. 82887 was issued to complainant, and the premium paid, and kept by the company, without requiring the signature

of the wife, and, when that was lost, No. 93977 was issued in lieu of it. Under these circumstances the defendant is estopped to rely upon the fact that No. 93977 was not signed by the wife in person, but by her husband for her. Under such circumstances the company would be bound by the certificate, even without the wife's signature.

We need not consider assignments Nos. 19 and 20, these being now immaterial in this court, since under other assignments already considered there must be a new trial.

The same observation is true of assignment No. 21.

This disposes of all of the assignments.

Let the judgment be reversed, and the cause remanded for a new trial. The complainant will pay the costs of the appeal.